[No. B140076. Second Dist., Div. Five. May 24, 2001.]

DANIEL R. SOLIN, Plaintiff and Appellant, v.
O'MELVENY & MYERS, LLP, Defendant and Respondent;
EDITH REICH et al., Interveners and Respondents.

452

## COUNSEL

Blecher & Collins and Maxwell M. Blecher for Plaintiff and Appellant.

Irell & Manella, Richard H. Borow, Harry A. Mittleman and Fernanda K. Lai for Defendant and Respondent.

Proskauer Rose and Lary Alan Rappaport for Interveners and Respondents.

## OPINION

**ARMSTRONG, J.**—Plaintiff Daniel R. Solin, an attorney, retained O'Melveny & Myers, LLP (O'Melveny) to obtain advice regarding Solin's representation of Edith Reich and Brigitte R. Jossem (together referred to as the Clients). In that regard, Solin disclosed certain privileged and confidential information of the Clients (the Secrets), which implicated them in criminal activities.

Solin sued O'Melveny for professional malpractice, alleging that O'Melveny failed to advise him of pertinent legal authority regarding one of

the matters on which he retained the law firm. The Clients intervened, seeking dismissal of the suit to avoid the disclosure of the Secrets. The trial court determined that O'Melveny could not effectively defend the action without disclosing the confidences of the Clients, and dismissed the lawsuit. We affirm the judgment of dismissal.

## FACTS

In 1993, Solin entered into a five-year agreement to act as outside counsel to the Clients, who were conducting business activities through a corporate entity, International Development and Trade Service, Inc. (IDTS).

Approximately six years earlier, in 1987, Mrs. Reich had been convicted in federal court in New York of a wire fraud in which she was charged with having fabricated $120 million of fraudulent orders for delivery to the then Soviet Union. She was sentenced to four months in prison.

On March 1, 1998, the 1993 agreement between Solin and the Clients expired. At that time, IDTS and its principals continued to be involved in multiple legal proceedings, and were the subject of a federal grand jury investigation. That normally secret information became public when the Clients asserted the Fifth Amendment privilege against self-incrimination in a civil case in the Southern District of New York involving Russian companies attempting to collect a $209 million judgment against IDTS. In that regard, an affirmation filed by their lawyer, Barry A. Bohrer, became a matter of public record.

In attempting to support his clients' claims of Fifth Amendment privilege, Mr. Bohrer disclosed the fact of the grand jury subpoenas, and asserted that document production and testimony in the civil case might implicate the Clients in the following violations of law: (1) underreporting of federal and state income taxes; (2) destruction, theft or hiding of corporate documents; (3) transfer of IDTS funds to personal or family-owned bank accounts; (4) use of corporate funds for purchase of personal real estate, art, jewelry and/or antiques; and (5) attempts to bribe the arbitration tribunal in Moscow. Mr. Bohrer argued that requiring Mrs. Reich and Ms. Jossem to produce documents and answer questions at depositions "may potentially furnish a link in the chain of evidence (if not itself constitute evidence) of violations of myriad federal and state criminal statutes." Mr. Bohrer identified the following laws as among those which could be implicated by the Clients' testimony or production of documents in the civil action: the Foreign Corrupt Practices Act; the Racketeer Influenced and Corrupt Organizations Act; the Money Laundering Control Act of 1986; the mail and wire fraud

statutes; the Travel Act; the federal conspiracy statute; and relevant state and federal tax fraud and tax evasion statutes.

The district court sustained the Clients' Fifth Amendment privilege claims, ruling that answers to the questions asked at deposition provided Mrs. Reich and Ms. Jossem with "reasonable cause to fear that their answers may furnish a link in the chain of evidence needed to prosecute them for criminal activity." (*AAOT Foreign Economic Ass'n (VO) Technostroyexport v. International Development & Trade Services, Inc.* (S.D.N.Y. Oct. 25, 1999.) No. 96 Civ. 9056, 1999 WL 970402, at p. *3 [1999 U.S. Dist. Lexis 16617].)

In early 1998, Solin and the Clients were negotiating the terms under which Solin would continue in his role as outside counsel. Solin was concerned that his continued representation would implicate him in any criminal proceedings that might be brought against the Clients. Solin consulted with two criminal lawyers, Elkan Abramowitz and Paul Goldberger. The former was current counsel to the Clients, and the latter had formerly represented them. Both Mr. Abramowitz and Mr. Goldberger assured Solin that his conduct was ethical and proper.

Solin raised two additional concerns with Mr. Goldberger. First, in order to induce Solin to continue in his representation of them, the Clients had threatened to sue him for alleged loans which were, in fact, fees. In addition, the Clients were refusing to pay for the five-year renewal term in advance, as they had done in 1993, or to provide security for five annual payments. Solin wished to determine the best way to protect himself against a contract dispute developing in the future. Mr. Goldberger told Solin that these questions were not within his expertise, and suggested that he discuss them with Alan Cohen, a criminal lawyer at O'Melveny.

Solin consulted with Mr. Cohen. The basis of this lawsuit concerns which matters the two men discussed. Solin contends that he asked Cohen to provide advice on three subjects: (1) his exposure to personal criminal liability arising out of his continued representation of the Clients; (2) how to deal with his clients' claim that fees paid were a loan; and (3) how to structure a new relationship that would best protect him against a future fee dispute, since the Clients were unwilling to pay fees for the five-year renewal term up front or to provide security for annual payments.

Solin sued O'Melveny based upon Cohen's alleged failure to provide him with competent advice concerning the payment terms of the Clients' renewal agreement. Specifically, Solin claims that O'Melveny's malpractice consisted of failing to call to his attention the New York line of cases permitting

"general retainers." Solin avers that, had he known of these cases, he "would have been entitled to hold Ms. Reich and Ms. Jossem responsible for the balance of the fees due for the remaining term of the retainer agreement in an amount of $4,680,000, plus interest."

Cohen, on the other hand, maintains that the parties did not discuss the payment terms of the Clients' renewal retainer agreement except as those terms impacted the criminal law advice rendered by O'Melveny. Thus, the resolution of the dispute between the parties concerns the substance of the discussions between Solin and Cohen concerning the legal advice sought and given in, essentially, a single meeting.

Concerned that prosecution of this lawsuit would result in disclosure of their privileged and confidential information, the Clients, together with Solin and O'Melveny, negotiated and entered into a "Stipulation and Order of Confidentiality," which was presented to and signed by the trial court on January 12, 2000. Several days later, the Clients filed an ex parte application for a protective order postponing Solin's deposition. Subsequently, on February 2, 2000, the Clients moved to dismiss the action or, in the alternative, for a protective order precluding the disclosure of their privileged and confidential information. The Clients argued below that the action must be dismissed because its prosecution and/or defense would necessarily result in the disclosure of the Clients' highly sensitive and privileged information. They maintained that "it is immaterial whether or not Solin needs to disclose Reich and Jossem's secrets and confidences to prove his case—O'Melveny has already stated that it will rely on Reich and Jossem's privileged information to defend itself, and this fact alone obligates Solin to dismiss the instant lawsuit."

The trial court concluded that O'Melveny could not effectively defend itself against Solin's claims of malpractice without reference to and use of the Clients' Secrets. Consequently, the trial court dismissed the action.

## DISCUSSION

At issue in this case is the protection to be accorded the attorney-client privilege. This privilege "has been a hallmark of Anglo-American jurisprudence for almost 400 years. (McCormick, Evidence (2d ed. 1972) § 87, pp. 175-179; 8 Wigmore, Evidence (McNaughton rev., 1961) § 2290, pp. 542-545; *Pritchard* [sic] v. *U.S.* (6th Cir. 1950) 181 F.2d 326, 328, affd. (1950) 339 U.S. 974 [ 94 L.Ed. 1380, 70 S.Ct 1029]; *Baird* v. *Koerner* (9th Cir. 1960) 279 F.2d 623, 629 [95 A.L.R.2d 303].) ▮ The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing,

confidential communications between attorney and client. (Evid. Code, § 950 et seq.)[1] Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. (*People* v. *Flores* (1977) 71 Cal.App.3d 559, 563 [139 Cal.Rptr. 546].) In other words, the public policy fostered by the privilege seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' (*Baird* v. *Koerner, supra,* 279 F.2d at p. 629.)" (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642].)

 "[T]he privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case." (*Gordon* v. *Superior Court* (1997) 55 Cal.App.4th 1546, 1557 [65 Cal.Rptr.2d 53]; see also *Shannon* v. *Superior Court* (1990) 217 Cal.App.3d 986, 995 [266 Cal.Rptr. 242].) "In California the privilege has been held to encompass not only oral or written statements, but additionally actions, signs, or other means of communicating information. (*Ex Parte McDonough* (1915) 170 Cal. 230, 234 [149 P. 566]; *Estate of Kime* (1983) 144 Cal.App.3d 246, 255 [193 Cal.Rptr. 718].) Furthermore, the privilege covers the transmission of documents which are available to the public, and not merely information in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy. (*In re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371, 526 P.2d 523].) While it is perhaps somewhat of a hyperbole to refer to the attorney-client privilege as 'sacred,'[2] it is clearly one which our judicial system has carefully safeguarded with only a few specific exceptions." (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 600.)

In sum, there can be no balancing of the attorney-client privilege against the right to prosecute a lawsuit to redress a legal wrong. Consequently, as

---

[1]"The privilege is set forth in Evidence Code section 954 as follows:

" 'Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

" '(a) The holder of the privilege;

" '(b) A person who is authorized to claim the privilege by the holder of the privilege; or

" '(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure.' "

[2]"See *People* v. *Kor* (1954) 129 Cal.App.2d 436, 447 [277 P.2d 94] (Shinn, J., conc.)."

*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164 [32 Cal.Rptr.2d 1, 876 P.2d 487] (hereafter *General Dynamics*) teaches, unless a statutory provision removes the protection afforded by the attorney-client privilege to confidential communications between attorney and client, an attorney plaintiff may not prosecute a lawsuit if in doing so client confidences would be disclosed. (*General Dynamics, supra,* at p. 1190.)

Solin argues that a proper reading of the Supreme Court's decision in *General Dynamics* requires that we reverse the judgment dismissing his lawsuit. Accordingly, we review the facts of that case in detail.

The plaintiff, Andrew Rose, worked for the defendant, General Dynamics Corporation, as an attorney. After 14 years with the company, he was summarily fired. Rose sued his employer for wrongful discharge, alleging that his termination was due to the fact that he spearheaded an investigation into employee drug use, protested the company's failure to investigate the bugging of the office of the chief of security, and advised company officials that the company's salary policy might be in violation of the federal Fair Labor Standards Act. Rose sought recovery under two theories: that his firing, without good cause, violated an implied-in-fact contract, and that his termination in retaliation for the conduct outlined above was in violation of fundamental public policies. General Dynamics demurred to Rose's complaint, contending that because Rose was an attorney he could be fired at any time for any reason, pursuant to our Supreme Court's decision in *Fracasse v. Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9]. That opinion held, in turn, that a client who retains an attorney to prosecute a personal injury lawsuit on a contingency fee basis has the right to discharge the attorney at any time and for any reason, subject to the attorney's right to recover the reasonable value of the services rendered up to the time of discharge.

The Supreme Court rejected General Dynamic's contention that *Fracasse v. Brent* mandated dismissal, cautioning that *Fracasse* "should not be read as standing for more than its context and rationale will reasonably support." (*General Dynamics, supra,* 7 Cal.4th at p. 1176.) As to Rose's cause of action for breach of an implied-in-fact contract, the court held that "no reason appears why an employer that elects to limit its at-will freedom to terminate the employment relationship with in-house counsel should not be held to the terms of its bargain." (*Id.* at p. 1178.) The court noted as well that "implied-in-fact limitations on a client-employer's right to discharge in-house counsel are not likely to present issues implicating the distinctive values subserved by the attorney-client relationship. Such suits can thus for the most part be treated as implied-in-fact claims brought by the nonattorney employee." (*Id.* at p. 1179.)

The court also sanctioned in-house counsel suits for retaliatory discharge in limited circumstances. Such lawsuits are permissible when (1) the "retaliatory discharge claims [are] founded on allegations that an in-house attorney was terminated for refusing to violate a mandatory ethical duty embodied in the Rules of Professional Conduct" and (2) when "in-house counsel's *nonattorney* colleagues would be permitted to pursue a retaliatory discharge claim *and* governing professional rules or statutes expressly remove the requirement of attorney confidentiality." (*General Dynamics, supra,* 7 Cal.4th at p. 1188.) The court further explained: "If . . . the conduct in which the attorney has engaged is merely ethically *permissible,* but not *required* by statute or ethical code, then the inquiry facing the court is slightly more complex. Under these circumstances, a court must resolve *two* questions: First, whether the employer's conduct is of the kind that would give rise to a retaliatory discharge action by a *non*attorney employee under *Gantt* v. *Sentry Insurance* [(1992)] 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680], and related cases; second, the court must determine whether some statute or ethical rule, such as the statutory exceptions to the attorney-client privilege codified in the Evidence Code (see *id.,* §§ 956-958) specifically permits the attorney to depart from the usual requirement of confidentiality with respect to the client-employer and engage in the 'nonfiduciary' conduct for which he was terminated." (*Id.* at p. 1189.) Thus, the Supreme Court made clear that an attorney-plaintiff may pursue an action for retaliatory discharge only if the claims are "grounded in *explicit* and *unequivocal ethical norms* embodied in the Rules of Professional Responsibility and *statutes*" (*id.* at p. 1189, or if the claims "are maintainable by the *non*attorney employee . . . under circumstances in which the Legislature has manifested a judgment that the principle of professional confidentiality *does not apply.*" (*Ibid.*)

The Supreme Court cautioned that "the in-house attorney who publicly exposes the client's secrets will usually find no sanctuary in the courts. Except in those rare instances when disclosure is explicitly permitted or mandated by an ethics code provision or statute, it is never the business of the lawyer to disclose publicly the secrets of the client. In any event, where the elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege, the suit must be dismissed in the interest of preserving the privilege." (*General Dynamics, supra,* 7 Cal.4th at p. 1190.)

Without reference to the particular factual scenario presented in *General Dynamics,* Solin cites two passages from that opinion and argues that they

mandate reversal of the judgment of dismissal. First, in following up on the statement quoted in the immediately preceding paragraph to the effect that a lawsuit which cannot be prosecuted without divulging privileged information must be dismissed, the Supreme Court stated: "We underline the fact that such drastic action will seldom if ever be appropriate at the demurrer stage of litigation." (*General Dynamics, supra*, 7 Cal.4th at p. 1190.) Second, Solin relies on the following instructive statement from the Supreme Court in *General Dynamics*: "[T]he trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege. The use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings, are but some of a number of measures that might usefully be explored by the trial courts as circumstances warrant. We are confident that by taking an aggressive managerial role, judges can minimize the dangers to the legitimate privilege interests the trial of such cases may present." (*Id.* at p. 1191.) However, as the Supreme Court put it, a case should "not be read as standing for more than its context and rationale will reasonably support." (*General Dynamics, supra*, p. 1176.) *General Dynamics* simply does not support the result that Solin suggests.

As to the first point, O'Melveny did not bring a demurrer to challenge the legal sufficiency to the complaint, nor did the trial court dismiss the action at "the demurrer stage" of litigation. The complaint itself, but three pages long, did not reveal that Solin disclosed to O'Melveny the Clients' Secrets. Because it provided no basis to conclude that the matter could not be litigated without disclosure of privileged information, a demurrer to the complaint would not have been productive.

Contrary to his suggestion that this litigation was dismissed in the "demurrer stage," Solin explains in his opening brief on appeal that "Discovery proceeded along normal lines (documents produced, interrogatories answered, depositions scheduled) until [O'Melveny] disclosed the existence of a handwritten memorandum made by Mr. Cohen contemporaneous with the original Solin meeting (the 'Notes')." Also prior to the hearing on the Clients' motion to dismiss, Solin, O'Melveny and the Clients had negotiated and entered into a protective order. At the time that the trial court considered the Clients' motion to dismiss, it was clear that the parties disagreed about the nature of the advice sought by Solin, and that both parties would rely on the testimony of the percipient witnesses to the Solin/O'Melveny consultation, which Solin acknowledges included the disclosure of the Clients' Secrets. Indeed, Solin asserts that this "conflict"

concerning what was discussed during the Solin/O'Melveny consultation "is likely to prove outcome determinative before a jury."

In short, the factual underpinnings of Solin's claim and O'Melveny's defense, including the latter's intention to examine witnesses concerning all of the matters discussed in the Solin/O'Melveny consultation and to introduce the Notes into evidence to corroborate Cohen's testimony, had been revealed at the time that the trial court ruled on the Clients' motion to dismiss. This, then, is the more "usual case" described by the Supreme Court in *General Dynamics*, in which the question of "whether the privilege serves as a bar to the plaintiff's recovery will be litigated and determined in the context of motions for protective orders or to compel further discovery responses, as well as at the time of a motion for summary judgment." (*General Dynamics, supra,* 7 Cal.4th at p. 1190.)

Solin also cites *General Dynamics* in support of its contention that the trial court was obliged to use its "equitable arsenal" to permit his lawsuit to proceed. Thus, Solin argues that "the trial judge failed to follow the admonition of the Supreme Court in *General Dynamics* . . . which mandates that in cases brought by a lawyer in which there is a danger of disclosing privileged information, 'the trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege.' ([*General Dynamics supra*, 7 Cal.4th] at p. 1191.)"

Solin fails to take into account the context within which the Supreme Court instructed the trial courts to fashion devices that would permit an attorney plaintiff to pursue legal redress against a former client without doing violence to the attorney-client privilege. In *General Dynamics*, the plaintiff lawyer alleged in his complaint that, due to the untoward conduct of his employer, he was no longer bound by the attorney-client privilege; thus, he argued that his lawsuit could be fully prosecuted without disclosing confidential information protected by that privilege. The employer disagreed, claiming that the plaintiff continued to be bound by the attorney-client privilege. It was in the context of these facts that the Supreme Court charged the trial court with the responsibility to permit the plaintiff to try to establish that he could in fact prove his case without divulging confidences subject to the attorney-client privilege.

*General Dynamics* and the other cases cited by the parties all concern a plaintiff who might need to disclose confidential information in order to make his case against a defendant who is the holder of the privilege. As

Solin argues, the Supreme Court in *General Dynamics* cautioned against dismissing such a case prematurely. However, whether or not a lawyer plaintiff can prove his or her case without disclosure of privileged information can be easily tested, by pretrial proceedings or by a motion for nonsuit after the plaintiff has presented his case-in-chief without the use of the confidential information.

Here, of course, there is no need to resort to the trial court's equitable arsenal to permit Solin to make the necessary proof: Solin claims, and we accept his representation, that he has no need to divulge any privileged information in order to prove his case. Solin then assures us that, contrary to the advice of its trial counsel, O'Melveny also has no need to divulge any privileged information in order to defend against Solin's claim of malpractice. Solin argues: "Because [his] case against [O'Melveny] does not depend at all on what they consulted about on the criminal side, Solin has no need to raise, much less disclose, privileged information. Of course, Solin has acknowledged that he did consult with Mr. Cohen about possible criminal exposure. That fact is not in dispute. Nonetheless, [O'Melveny] argues that it cannot defend this professional negligence case without disclosing privileged evidentiary details revealed by Solin in the course of seeking that advice from Mr. Cohen. The singular issue, therefore, is whether [O'Melveny] will be prejudiced in its defense of this professional malpractice case if it cannot disclose the evidentiary details of the Reich/Jossem privileged matters communicated by Solin to Mr. Cohen in the course of seeking advice as reflected in the Notes."

Defendant does not have the same opportunity to test whether the charges can be successfully defended without the use of the Clients' Secrets. It may very well be that, were this lawsuit to proceed, a jury would render judgment in favor of O'Melveny even without any testimony from Cohen regarding the "evidentiary details" that Solin disclosed to him when he sought legal advice. In that event, we could say, after the fact, that O'Melveny did not "need" to disclose the Clients' Secrets in order to defend itself. If, however, O'Melveny is made to defend itself without use of the Clients' Secrets, and a jury returns a verdict for Solin, we cannot know whether the verdict would have been different had O'Melveny been permitted to present all relevant evidence regarding its consultation with Solin, including the Clients' Secrets.

Solin's argument must therefore rest on the contention that O'Melveny will not be prejudiced in its defense of the malpractice action if it is prohibited from introducing what Solin refers to as the "evidentiary details" of the conversation between Solin and Cohen. However, Evidence Code

section 351 provides that, "Except as otherwise provided by statute, all relevant evidence is admissible." And there can be no doubt that what Solin told O'Melveny in order to obtain legal advice which Solin now claims was faulty is relevant evidence. Thus, the equitable tool that Solin proposes is to preclude O'Melveny's introduction of relevant evidence. Limiting this evidence would give a distorted view of the Solin/O'Melveny consultation, and would keep from the jury the facts that Solin determined that O'Melveny needed to know in order to render a legal opinion, and the facts on which O'Melveny based its legal advice, and would deprive O'Melveny of its right to cross-examine its accuser on the "critical issue" of Solin's credibility. Clearly, O'Melveny would be prejudiced by the presentation to the fact-finder of a limited and distorted view of the facts underlying this lawsuit.

In sum, O'Melveny is entitled to present to the jury all relevant information consistent with whatever strategy it determines best serves its interests, regardless of Solin's views of the "necessity" of the evidence. O'Melveny has indicated its intention to elicit full and extensive testimony concerning the substance and details of the discussion between Solin and Cohen, including the Clients' Secrets, and to introduce the Notes to corroborate Cohen's recollection of that consultation. Pursuant to Evidence Code section 955, Solin would be duty-bound to object to any such testimony or other evidence that revealed his Clients' Secrets.[3] The trial court must exclude information subject to a claim of privilege (Evid. Code, § 916), and therefore must sustain the objection. Solin would benefit from the exclusion of evidence that could bolster O'Melveny's defense and its credibility. Thus, solely as a result of his disclosure of his Clients' confidences, Solin would obtain an unfair advantage in his lawsuit against O'Melveny. Nothing in *General Dynamics* or in any other case cited by Solin countenances this result.

It strikes us as fundamentally unfair for a client to sue a law firm for the advice obtained and then to seek to forbid the attorney who gave that advice from reciting verbatim, as nearly as memory permits, the words spoken by his accuser during the consultation. Simple notions of due process counsel against such a procedure. Evidence Code section 958 codifies this sentiment. It provides: "There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." This is so because "[i]t would be unjust to permit a client . . . to accuse his attorney of a breach of duty

---

[3]Evidence Code section 955 provides: "The lawyer who received or made a communication subject to the privilege under this article shall claim the privilege whenever he is present when the communication is sought to be disclosed and is authorized to claim the privilege under subdivision (c) of Section 954."

and to invoke the privilege to prevent the attorney from bringing forth evidence in defense of the charge . . . ." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 958, p. 249; see also *Durdines v. Superior Court* (1999) 76 Cal.App.4th 247, 255 [90 Cal.Rptr.2d 217] [when an attorney's competence is assailed by a former client, "[i]t is only fair" that the attorney be able to " 'adequately defend his professional reputation, even if by doing so he relates confidences revealed to him by the client' "].)

Here, of course, Solin maintains that he is not invoking his attorney-client privilege vis-à-vis O'Melveny. However, the fact that the Clients' Secrets must be protected from disclosure would yield precisely the same result: Solin would be permitted to sue his lawyers for malpractice, yet gag O'Melveny in defending the charge by preventing full disclosure of all matters counseled upon. This result is especially unsatisfactory where, as here, we are faced with this issue only because Solin chose to divulge the "evidentiary details" of his Clients' Secrets rather than withholding those details from his communications to Cohen and presenting a hypothetical scenario that would have permitted him to obtain the legal advice he sought without disclosing client confidences.

Solin also argues that the protective order that he, O'Melveny and the Clients entered into adequately protected the Clients' interests. Thus, he states, "The extensive three-party Confidentiality Order, entered in this case with the consent of the litigants, provided for protection of privileged information during discovery, in court filings, and required notice to Mrs. Reich and Ms. Jossem if either side intended to make disclosure in open court during trial." However, the protective order does not restrict O'Melveny's right to defend itself by using information regarding Solin's criminal concerns and his disclosures of the Clients' Secrets to Cohen. The order states: "This stipulation shall not restrict the use or disclosure of information or documents not obtained as a result of this action . . . ." Thus, under the protective order, Cohen is free to testify fully regarding the disclosures that Solin made to him, and O'Melveny may introduce as evidence the contemporaneous notes that Cohen took during his discussions with Solin.

Solin suggests as well that the trial court could limit discovery, trial testimony and other evidence to matters that Solin refers to as being in the public record. We mentioned above the due process problems presented in precluding O'Melveny's presentation of competent, relevant evidence to defend the malpractice claim. Putting those concerns aside, the proposal lacks merit. It is based on an affirmation filed by another of the Clients'

attorneys, Barry Bohrer, in an unrelated New York case. As noted above, the affirmation asserted the Clients' constitutional privilege against self-incrimination. It stated that the Clients had been asked deposition questions about matters pertaining to "potential" criminal activities, and that "any response provided may potentially furnish a link in the chain of evidence (if not itself constitute evidence) of violations of myriad federal and state criminal statutes . . . ." The affirmation did not admit that the Clients were guilty of any crime, or disclose any evidence of wrongdoing, or otherwise waive the attorney-client privilege with respect the matters that the Clients disclosed to Solin in confidence, and that Solin disclosed to O'Melveny.

Lastly, in his reply brief, Solin faults the trial court for failing to review the Notes in camera to determine whether they could be redacted without prejudice to O'Melveny's defense.[4] Solin argues that "when the issue relates to the disclosure of privileged material, in camera review is not only permitted, it is recognized by this Court as the only effective means to process disclosure questions," citing *Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599 [56 Cal.Rptr.2d 341]. This case does not support the procedure belatedly demanded by Solin.

Solin's entire discussion of *Lipton v. Superior Court, supra,* 48 Cal.App.4th 1599, upon which he relies for the proposition that the trial court erred in failing to review the Notes in camera, is as follows: "The remand order in Lipton directing the trial court to consider redaction and protective orders in its *in camera* review (*id.* at 1620), is precisely what should have been done here and is exactly what this Court should now order." *Lipton* stands for no such proposition. The Court of Appeal in *Lipton* was careful to state that any review of privileged information undertaken by the trial court would be conducted only "to the extent permitted by law or the agreement of the party claiming the privilege, . . ." (*Lipton v. Superior Court, supra,* at p. 1619.) The appellate court then noted that "it is generally true that the court cannot compel disclosure of the contents of privileged documents in order to rule on the objection to a discovery request [citations]." (*Ibid.*) The court indicated that "In this case, it appears that [the defendant and privilege holder] permitted the referee to examine all of the privilege log documents in order to enable him to rule on the objections to [the plaintiff's] motion to compel." (*Id.* at p. 1619, fn. 21.)

■ Here, there is no law permitting an in camera review of the privileged materials, nor did the privilege holder agree to such a procedure.

---

[4]While Solin argued in his opening brief on appeal that the Notes could be redacted to omit the evidentiary details, he did not indicate whether the redaction should be conducted by the trial court, the parties, or the Clients. He did not cite as error in his opening brief the trial court's failure to review the notes in camera.

Indeed, the relevant statute, Evidence Code section 915, specifically admonishes that, except in circumstances not here relevant, "the presiding officer may not require disclosure of information claimed to be privileged under this division in order to rule on the claim of privilege; . . ."[5] As our Supreme Court stated in reversing a Public Utilities Commission order of an in camera review of privileged documents: "We note that the commission's order is not any less intrusive because it only requires an 'in camera' inspection of SoCalGas's privileged documents. The commission's order violates Evidence Code section 915 . . . . [T]he commission's order not only would allow the presiding officer to identify whether documents are protected by the attorney-client privilege, but also would permit the commission to consider the relevance of the documents on the merits. There is no statutory or other provision that allows for such an inspection of documents allegedly protected by the attorney-client privilege." (*Southern Cal. Gas Co. v. Public Utilities Com.* (1990) 50 Cal.3d 31, 45, fn. 19 [265 Cal.Rptr. 801, 784 P.2d 1373].) In short, *Lipton* provides no authority for the procedure proposed by Solin.

█ In sum, the central disputed issues in this case center on what Solin disclosed and why, what legal advice O'Melveny rendered to Solin and why, how Solin's disclosures shaped and influenced that legal advice, and how Cohen's criminal law advice affected Solin's decision to structure the retainer agreement with the Clients. Resolution of those issues rests mainly on the credibility of the parties to the Solin/O'Melveny consultation. O'Melveny maintains that in order to defend its representation of Solin, it must be free to recite the precise factual scenario which Solin presented to Cohen, including Solin's concerns about the Clients' involvement in criminal activities. It is only by disclosing exactly what Solin communicated to Cohen as the concerns prompting his retention of O'Melveny that Cohen can cogently explain the reasons that he gave the advice that he did. Thus, while Solin asserts that he consulted O'Melveny principally to obtain contract law advice, that assertion would be undermined by Cohen's testimony regarding Solin's detailed disclosure of privileged information concerning the Clients' alleged criminal conduct. Similarly Cohen's credibility would be enhanced by the admission of his contemporaneous notes of the meeting, which again, according to both parties, contain confidential and privileged information of the Clients which Solin is duty-bound to protect from further disclosure.

---

[5]Solin argues that Evidence Code section 915 does apply because he admits that the Notes contained privileged information. This assertion is wholly unsupported by any pertinent authority, and cannot be supported by reason and logic. The clear import of Evidence Code section 915 is that a privilege holder is not required to waive the privilege (by submitting to an in camera procedure) in order to assert the privilege.

We conclude that because this lawsuit "is incapable of complete resolution without breaching the attorney-client privilege, the suit may not proceed." (*General Dynamics, supra,* 7 Cal.4th at p. 1170.) Accordingly, we affirm the trial court's dismissal of the case.

## DISPOSITION

The judgment is affirmed. Respondents to recover costs of appeal.

Grignon, Acting P. J., and Willhite, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 8, 2001. George, C. J., did not participate therein.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.