Craig **MILHOUSE**; Pamela Milhouse, Plaintiffs,

v.

**TRAVELERS COMMERCIAL INSURANCE COMPANY,**
Defendant.

**Case No. SACV 10–01730–CJC(ANx).**

United States District Court,
C.D. California,
Southern Division.

Nov. 5, 2013.

---

Anthony Lawrence Cannon, Debra K. Cook, Julia A. Mouser, Robert W. Nelms, Cannon and Nelms APC, Anaheim, CA, for Plaintiffs.

Marjie D. Barrows, Edward Patrick Murphy, Matthew S. Ponzi, G. Edward Rudloff, Jr., Jennifer N. Wahlgren, Foran Glennon Palandech Ponzi & Rudloff PC, Emeryville, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR REMITTITUR OR IN THE ALTERNATIVE A NEW TRIAL, DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING PLAINTIFFS' MOTION FOR A NEW TRIAL, AND DENYING PLAINTIFFS' MOTION FOR PRE-JUDGMENT INTEREST**

CORMAC J. CARNEY, District Judge.

## INTRODUCTION AND BACKGROUND

Plaintiffs Craig Milhouse and Pamela Milhouse owned a home in Yorba Linda,

California. Their home was insured by Defendant Travelers Commercial Insurance Company ("Travelers"). In November 2008, the Yorba Linda Freeway Complex fire swept through Dr. and Mrs. Milhouse's neighborhood and consumed their home. A total loss resulted, with the structure of the home itself and the personal property contained within it all lost in the blaze. Dr. and Mrs. Milhouse tendered a claim to Travelers on their homeowner's insurance policy to be compensated for October 2010, the Milhouses filed suit against Travelers, alleging breach of contract and breach of the covenant of good faith and fair dealing. The Milhouses additionally sought punitive damages. On August 13, 2013, this Court empaneled a jury and commenced a two-week trial of the Milhouses' claims. After considering the evidence and testimony presented by both parties, the jury returned a verdict in favor of Dr. and Mrs. Milhouse on their breach of contract claim, awarding them $1,949,634 in damages, or $974,817 each. The jury also found, however, that in breaching its contract with the Dr. and Mrs. Milhouse, Travelers did not act in bad faith, and that the Milhouses were not entitled to punitive damages. Before the Court are competing post-trial motions filed by both parties.

Dr. and Mrs. Milhouse move for a new trial on only their cause of action for breach of the covenant of good faith and fair dealing, or alternatively, for a new trial on both of their causes of action. (Dkt. No. 372 ["Pls.' Mot. for New Trial"].) They additionally move to alter the judgment to account for prejudgment interest. (Dkt. No. 365.) Travelers moves for judgment as a matter of law, (Dkt. No. 380 ["Def.'s Mot. for JMOL"]), or for remitti-

tur of the damage award or a new trial on the Milhouses' breach of contract cause of action, (Dkt. No. 378 ["Def.'s Mot. for New Trial"]). For the reasons stated herein, Travelers' motion for a remittitur, or in the alternative a new trial, is GRANTED. Its motion for judgment as a matter of law, and the Milhouses' motion for a new trial on breach of the covenant of good faith and fair dealing or on all causes of action, are DENIED. Additionally, the Milhouses' motion to alter the judgment to include prejudgment interest is DENIED.[1]

The Court finds that the jury faithfully discharged its duties and, with one limited exception, returned a reasonable verdict supported by the evidence presented. The jury only overestimated the damages recoverable by Dr. and Mrs. Milhouse for breach of contract. The Court therefore upholds the jury's verdict in all other respects, and reduces the contract damages award to the maximum amount supportable by the evidence.

## ANALYSIS

### I. Travelers' Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a) and (b), a court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" as to an issue on which that party has been fully heard during trial. A party seeking judgment as a matter of law has a "very high" standard to meet. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir.2002). The jury's verdict must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is sufficient evidence for a reasonable jury to have found in the nonmoving party's favor.

---

**1.** The Milhouses additionally move to augment the trial record. (Dkt. No. 377.) That motion is unopposed by Travelers, (Dkt. No. 391), and is hereby GRANTED.

*Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir.2001).

In its motions for judgment as a matter of law and for renewed judgment as a matter of law, (Dkt. No. 336; Def.'s Mot. for JMOL), Travelers argues that it was not in breach of contract by naming the IRS as a co-payee on a benefits check issued to the Milhouses, that the policy's Additional Replacement Cost Protection ("ARCP") Endorsement was not triggered, and that the Ordinance or Law coverage of the policy was not triggered. It additionally argues that the Milhouses cannot establish through the evidence presented that Travelers was in breach of its dwelling, alternative living expenses, or loss of use coverage obligations. As described more fully in the context of Travelers' motion for a new trial, both its legal conclusions and its argument that the evidence does not support a verdict in favor of Dr. and Mrs. Milhouse on the issue of breach of contract fail. Substantial evidence was presented at trial by which the jury could hold Travelers liable for breach of contract.

## II. Travelers' Motion for a New Trial on Breach of Contract

 Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted." Courts are thus "bound by those grounds that have been historically recognized" for a new trial, including claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.2007). Where the moving party's motion is premised on a claim that the jury's verdict is against the clear weight of the evidence, a new trial should

be granted where, after giving full respect to the jury's findings, the judge "is left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371–72 (9th Cir.1987); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir.2001) ("[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'") (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)). Of course, the district court "may not grant a new trial simply because it would have arrived at a different verdict." *Id.*

 In deciding a motion for a new trial, the district court may, in its discretion, "grant the motion and order a new trial on damages or deny the motion and reinstate the judgment in favor of [Defendant] and against [Plaintiff], or grant a remittitur with the alternative of a new trial if the remittitur is not complied with." *Minthorne v. Seeburg Corp.*, 397 F.2d 237, 244–45 (9th Cir.1968). Where the court decides to offer the option of a remittitur, the jury's verdict should be reduced to the "maximum amount sustainable by the proof," so as to ensure that the court's judgment is not substituted for that of the jury. *D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir.1982). "If the prevailing party does not consent to the reduced amount, a new trial must be granted." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir.1983). On the other hand, "[i]f the prevailing party accepts the remittitur, judgment must be entered in the lesser amount." *Id.*

Travelers argues that the limits of the Milhouses' insurance policy constitute their maximum recoverable damages under a breach of contract theory. (Def.'s Mot. for New Trial at 9.) Travelers contends that the maximum possible recovery to which the Milhouses could have been entitled was $674,634, rather than the $1.8 million recovery the jury awarded Dr. and Mrs. Milhouse. Travelers is mistaken. Basic principles of contract law provide that where a party is in breach of its contractual obligations, it is responsible not only for damage incurred under the contract's terms but also for those reasonably foreseeable damages that arise out of the breach. *See Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal.4th 960, 970, 22 Cal.Rptr.3d 340, 102 P.3d 257 (2004) ("[T]he nature of the contract or the circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be 'the probable result' of the defendant's breach."). California courts view this principle as having been incorporated into California Civil Code section 3300's definition of the damages available for breach of contract. *Id.* The jury's award must therefore be examined for evidence of breach and for damages available under the policy itself, as well as for those damages that were reasonably foreseeable as a result of the breach.

After so evaluating the jury's verdict, the Court finds it necessary to remit the damage award. Based on the evidence presented, the maximum award support-able by the evidence is $1,076,634. The Milhouses may accept this remitted damage award and judgment will be entered accordingly, or reject it, in which case a new trial will be had on only their breach of contract claim.

## A. Dr. and Mrs. Milhouse's Recovery Under the Insurance Policy

Under their policy, Dr. and Mrs. Milhouse claimed damages arising from Travelers' breach of six different policy coverages: (1) for loss of their dwelling and to replace their dwelling; (2) for their personal property; (3) for their other structures including driveways, walkways, and fences[2]; (4) for their trees, plants, and lawns; (5) for building ordinance and code costs to replace their dwelling; and (6) for additional living expenses. (Dkt. No. 346 ["Jury Instr."] No. 26.) Given the stated policy limits, there is no dispute that the maximum possible recovery the jury could have awarded the Milhouses under the policy itself was $674,634.[3] (*See* Dkt. No. 406 ["Aug. 19, Vol. 2 Transcript"] at 103:2–106:5 (McKinnon).)

### 1. Dwelling Coverage

Dr. and Mrs. Milhouse's dwelling coverage provides them protection "against risk of direct physical loss" of their home, not including the land upon which it is located. (Dkt. No. 379–12 ["Policy"] at 10, 17.) Under the policy, until repair or replacement of their dwelling is complete, the Milhouses are entitled to "no more than the actual cash value of

---

**2.** While the Milhouses appeared to argue at trial that Travelers breached its obligations under this coverage of the policy, they do not claim damages arising from such breach. The issue therefore need not be further explored here.

**3.** Travelers argues that that number is further decreased to $413,323 when adjusted to de-

duct the $166,711 payment Travelers made to the Milhouses with the IRS named as co-payee, and the $94,000 Ordinance or Law coverage which Travelers contends is unavailable to the Milhouses. (Def.'s Mot. for New Trial at 9.) As described below, the Court rejects both of these arguments.

the damage," (Policy at 22), which is further defined to mean "the amount it would cost to repair or replace the covered property, at the time of the loss, with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence." (Policy at 38.) If the actual cash value of the dwelling is found to be more than the policy limits, set at $742,000 under their 2008 insurance policy, the Milhouses are entitled to recover the policy limits. *See* Cal. Ins.Code §§ 2051(b)(1), 2051.5. In light of the substantial evidence that was presented, the jury reasonably could have found that the actual cash value of Dr. and Mrs. Milhouse's home, as defined under the policy, exceeded the policy limits even when including the ARCP Endorsement, and that therefore, the Milhouses were entitled to recover the policy limits of their dwelling coverage. Because Travelers has not paid the policy limits, the jury could find such failure to be a breach of its contractual obligations to the Milhouses.

#### a. Evidence Presented at Trial

Travelers presented testimony to establish that the replacement cost of Dr. and Mrs. Milhouse's home was $692,000. (*See* Dkt. No. 407 ["Aug. 20 Transcript, Vol. 2"] at 26:7–19 (Thomas).) The $692,000 bid to rebuild the Milhouse home was provided to Travelers by Associated Construction Services, Inc. ("ACS"), a construction consulting firm. (Aug. 19 Transcript, Vol. 2 at 147:5–11 (Reid).) Travelers relied on the ACS bid to determine that its obligations under the policy's dwelling coverage was no greater than $692,000, the home's actual cash value. (Dkt. No. 349 ["Aug. 13 Transcript"] at 221:1–4 (Ballinger).)

Competing testimony was presented by which the jury could have reasonably found that the ACS estimate of $692,000 understated the actual replacement cost of the Milhouse home. At trial, the jury was presented with descriptions of the Milhouse home. It heard, for example, that prior to the fire, the home was approximately 4,000 square feet, with four bedrooms, three-and-a-half bathrooms, and an additional 800 square foot garage. (Dkt. No. 354 ["Aug. 14 Transcript"] at 178:11–15 (Ellis).) It additionally heard that the home had upgraded floors, countertops, and bathroom fixtures, as well as crown molding. (Dkt. No. 351 ["Aug. 16 Transcript"] at 42:1–4 (P. Milhouse).)

The jury also heard testimony that the Milhouses had obtained an estimate from a construction contractor, Clark Canright, placing the replacement cost of the home at approximately $922,000, not including "soft costs" like architectural fees and engineering. (*See, e.g.,* Aug. 16 Transcript at 67:16–70:22 (P. Milhouse); Dkt. No. 405 ["Aug. 19 Transcript, Vol. 1"] at 71:18–72:21 (C. Milhouse).) Mrs. Milhouse explained that Mr. Canright, in forming his estimate, had undertaken action such as measuring a neighbor's similar home. (Aug. 16 Transcript at 69:2–21 (P. Milhouse).) Putting the Canfield bid in context for the jury, William Reid testified to the differences between the ACS estimate and the Canfield estimate, as well as the different assumptions made by the competing bids as to framing costs and supervisory costs that would be incurred in building the home. (Aug. 20 Transcript, Vol. 1 at 15:16–16:4 (Reid).)

Finally, the jury heard evidence about the market price at which the Milhouse home would have sold had it not been lost in the fire. Real estate appraisers placed the value of the home, excluding the land upon which it was built, at between $830,000 and over $1 million. (Aug. 13 Transcript at 138:13–22 (Chatfelter); Aug. 13 Transcript at 187:10–16, 196:6 (Ellis).) Further, Travelers itself had insured the

home at nearly $1,000,000, which the Milhouses' expert, Edward McKinnon, testified was a "red flag" that ACS's $692,000 estimate to replace the home was too low. (Aug. 19 Transcript, Vol. 2 at 165:25–168:1 (McKinnon).)

Weighing the competing expert opinions and estimates regarding the cost to replace the Milhouse home, and applying its own reasonable inferences as to the cost of building a home worth more than $1 million on the market, the jury reasonably could have found that the actual cash value of replacing the Milhouse home exceeded the dwelling coverage limits as amended by the ARCP Endorsement, even after subtracting its depreciated value. Because Travelers has not yet paid Dr. and Mrs. Milhouse the policy limit for their dwelling coverage, the jury reasonably found that Traveler's was in breach of its contractual obligations.[4] Based on the evidence presented at trial, the maximum supportable recovery for dwelling coverage is the difference between the policy limit and the amount already paid by Travelers to the Milhouses—a sum of $291,156.

### b. Amendment of the Policy Limits by the Additional Replacement Cost Protection Endorsement

The Milhouses claim damages based on a policy limit set at $946,000, when adjusted for inflation. That figure is the dwelling coverage limit, amended to include the ARCP Endorsement, which, when triggered, increases the dwelling coverage limit by an additional 25 percent. (Policy at 33.) Travelers argues that the inclusion is in error as a matter of law. (Def.'s Mot. for JMOL at 7–8.)

The ARCP Endorsement provides additional protection to the insured on the policy's dwelling coverage. The Endorsement provides that its provisions will be triggered "after a loss, provided [the insured] elect[s] to repair or replace the damaged dwelling." (Policy at 33; Def.'s Mot. for JMOL at 8.) Travelers argues that the ARCP Endorsement "is not available until plaintiffs have replaced the destroyed dwelling and the cost of the replacement has exceeded the Dwelling limit." (*Id.* at 33.) Nothing in the ARCP Endorsement indicates that "elect" should be interpreted to require an insured to actually complete the repair or replacement of their dwelling, rather than evincing an intent to repair or replace their dwelling. In fact, Travelers' interpretation of the clause would read out the ARCP Endorsement's use of the word "elect" entirely. *Cf. Minich v. Allstate Ins. Co.*, 193 Cal.App.4th 477, 122 Cal. Rptr.3d 769 (2011) (holding that an insured was not entitled to recover through their Endorsement coverage where the policy actually required the insureds to "repair, rebuild, or replace [their] . . . covered property" before the Endorsement would be triggered). At the very least, the clause is ambiguous, and therefore requires the Court to "construe it in favor of coverage." *See Fraley v. Allstate Ins. Co.*, 81 Cal.App.4th 1282, 1289, 97 Cal. Rptr.2d 386 (2000) (citing *Titan Corp. v. Aetna Cas. & Sur. Co.*, 22 Cal.App.4th 457, 469, 27 Cal.Rptr.2d 476 (1994)). Therefore, the ARCP Endorsement in the Milhouses' policy applies, with the policy limits "amended" to provide an additional amount of insurance up to 25 percent of the policy limits, (*see* Policy at 33 ("To the extent coverage is provided, we agree to *amend* the present limits of liability.") (emphasis added)), so long as the Milhouses can show that they "elected" to

---

4. Additional evidence as to the issue of breach that was presented to the jury included, for example, testimony from Travelers' adjuster

Mr. Ballinger that in his view, policy benefits "should have [been paid] out sooner." (Aug. 13 Transcript at 112:24–113:4 (Ballinger).).

repair or replace their home. Of course, until the home is rebuilt, under the policy, the Milhouses are entitled to no more than the actual cash value of the home. (Policy at 33.)

Based on the evidence presented, the jury rightly could have found that Dr. and Mrs. Milhouse "elected" to repair or replace their dwelling, thereby triggering the ARCP Endorsement. The jury heard testimony that the Milhouses had discussed rebuilding their home with different contractors and at the time of trial still intended to rebuild it, (*see* Aug. 16 Transcript at 72:2–78:10 (P. Milhouse)), that they had obtained permits from the City of Yorba Linda to rebuild their home, (*see id.* at 76:2–77:13 (P. Milhouse)), that they had incurred some $75,000 in costs to pay architects and engineers to that end, (*see* Aug. 19 Transcript, Vol. 1 at 8:18–10:10 (C. Milhouse)), and that Travelers knew of their plans to rebuild their home, (*see* Aug. 13 Transcript at 145:18–146:3 (Ballinger)). Heard in conjunction with testimony that the actual cash value of the Milhouse home exceeded the policy limits even when accounting for the ARCP Endorsement, the jury reasonably could have found that Dr. and Mrs. Milhouse were entitled to recover the full policy limit of the dwelling coverage including the ARCP Endorsement, or approximately $946,000 when adjusted for inflation.

### c. Inclusion of the IRS as Co–Payee

Travelers contends that the maximum recoverable award for breach of contract must be reduced by $166,711, the amount it paid to Dr. and Mrs. Milhouse for their dwelling coverage benefits with the IRS named as co-payee. The policy states that Travelers will pay the Milhouses the policy benefits "unless some other person is named in the policy or is legally entitled to receive payments." (Policy at 38.) Travelers argues that as a matter of law, the

IRS, which had issued two Notice of Federal Tax Liens ("NFTL") on the Milhouses' property, was legally entitled to payment of the policy benefits. Therefore, the jury could not have found that under the policy, Travelers breached its obligation to the Milhouses by paying the IRS the amount of the noticed tax liens.

▮ "When a taxpayer fails to pay his or her federal individual income tax, a lien in favor of the government arises by operation of law on the taxpayer's property and rights to property, whether held by the taxpayer or by a third party." *Stead v. United States*, 419 F.3d 944, 946 (9th Cir.2005) (citing I.R.C. § 6321). However, "[a] federal tax lien ... is not self-executing. Affirmative action by the IRS is required to enforce collection of the unpaid taxes." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). One of two procedures may then be used by the government to perfect its lien: the IRS may either serve an administrative levy pursuant to I.R.C. § 6331, or file a lien-foreclosure suit in federal district court pursuant to I.R.C. § 7403. *Stead*, 419 F.3d at 946. To recover funds through an administrative levy on property in possession of a third party, the IRS should serve notice of levy on the third party in possession of the property, and additionally send a copy of the notice to the taxpayer. *Id.* By serving such notice, the IRS obtains "the right to all property levied upon, and creates a custodial relationship between the person holding the property and the IRS so that the property comes into the constructive possession of the Government." *Id.* (citing *Nat'l Bank of Commerce*, 472 U.S. at 720–21, 105 S.Ct. 2919).

▮ While Travelers argued that the IRS had filed a Notice of Federal Tax Lien against the Milhouses with the Orange County Recorder's Office, no evi-

dence was presented to suggest that the IRS ever took any additional affirmative action, either by serving Travelers with an administrative levy or by filing a lien-foreclosure suit, to recover the owed funds. (*See* Aug. 20 Transcript at 65:24–66:17 (Frederick).) Therefore, Travelers' contention that as a matter of law—and pursuant to the terms of the policy—it was obligated to name the IRS as co-payee of the Milhouse claim is incorrect. The jury rightly could have found, and did find, that Travelers remains obligated to pay the $166,711 to the Milhouses.[5]

#### d. Damages for Dwelling Coverage

Including the ARCP Endorsement benefits under the Milhouse policy, the policy limit for dwelling coverage was $946,003.63. The parties do not dispute that of that amount, $291,156 remains owing when not accounting for the $166,711 that Travelers paid to the Milhouses with the IRS named as co-payee. As the evidence described above shows, the jury rightly could have found that Travelers *remained in breach of its obligations to the Milhouses in the amount of $291,156.*

#### 2. Personal Property Coverage

■■■ The policy's personal property coverage provides protection against loss of "personal property owned or used by an 'insured' while it is anywhere in the

world." (Policy at 10, 18.) There is no dispute that the policy limit of Dr. and Mrs. Milhouse's personal property coverage is $519,400. (*Id.* at 2.) There is also no dispute that Travelers made a $263,790.68 payment to the Milhouses as part of its personal property coverage obligations within weeks of the fire. (*See* Aug. 16 Transcript at 244:17–25 (P. Milhouse).) However, Travelers argues that under the policy, it was not obligated to pay the Milhouses for any personal property coverage because the Milhouses did not fulfill their own obligation to cooperate under the policy. (Def.'s Mot. for JMOL at 10.) In particular, Travelers contends that the Milhouses' failure to provide a sworn proof of loss shows that Travelers did not breach its obligations to the Milhouses and, moreover, that by such failure Travelers was prejudiced.[6] (*Id.* at 10–11.) On the basis of substantial evidence suggesting otherwise, the jury disagreed.

While the Travelers insurance contract does require an insured to provide a proof of loss within 60 days after a demand is made, Travelers did not assert the defense that the Milhouses forfeited their right to claim benefits under the personal property coverage portion of the policy, and substantial evidence was presented in any event to suggest that Travelers waived the 60–day requirement. (*See, e.g.*, Aug. 16

---

5. The Milhouses argue in their motion for a new trial that the Court erred in not instructing the jury that IRS tax liens are not self-executing. The Court was not obligated to instruct the jury in such a manner. As related to their claim for bad faith, it was a matter of fact for the jury to determine whether by naming the IRS as a co-payee on the Milhouses' check, Travelers had acted in bad faith.

6. Travelers seems to suggest that by its Order of June 25, 2013, the Court agreed that Travelers was prejudiced as a matter of law by the Milhouses' delay in submitting a proof of loss. (Def. Mot. for JMOL at 11 (citing Dkt. No. 270

["June 25 Order"]).) Travelers is mistaken. In its June 25 Order, the Court held that Travelers would be prejudiced by a failure to provide for limited additional discovery into the Milhouses' proof of loss claim. (June 25 Order at 4.) The Court did not find that Travelers was prejudiced such that it could not be held in breach of contract as a matter of law. Such a determination is within the province of the jury. At trial, Travelers was given an opportunity to be heard on the issue, and the jury found, on the basis of the evidence presented, that Travelers did breach its contractual obligations.

Transcript at 78:23–79:13 (P. Milhouse).) The questions for the jury, then, were whether benefits were owing, in what amount, and whether that amount had been paid. Based on the evidence presented, the jury reasonably found that benefits remained owing to the Milhouses in an amount of $257,972, the difference between the policy limits and the amount already paid on the claim.

At trial, the jury was presented with Dr. and Mrs. Milhouse's sworn proof of loss statement, dated March 12, 2012. (Dkt. No. 393–8 ["Proof of Loss"].) The statement included a 55–page contents inventory in which the Milhouses outlined the personal property they lost in the fire and its value. (*See id.*) They claimed the actual cash value of the property to be upwards of $590,000, and that their whole loss and damages were nearly $740,000. (*Id.* at 1.) While the proof of loss was not sworn, this evidence, in combination with other testimony about the contents of the Milhouse home, (*see, e.g.,* Aug. 16 Transcript at 80:21–84:16 (P. Milhouse); Aug. 19 Transcript, Vol. 1 at 108:24–109:12 (C. Milhouse)), provided the jury a substantial basis from which to determine that the Milhouses are entitled to receive the policy limits on their personal property claim. Because they have thus far been paid only $263,000 of that amount, an award of $257,972 on personal property is supported by the evidence.

### 3. Loss of Use (Additional Living Expenses) Coverage

■ Plaintiffs' expert Edward McKinnon presented testimony that by his calculation, under the policy, $24,531 remained owing in additional living expenses coverage under the policy. (*See* Aug. 19 Transcript, Vol. 2 at 105:21–106:1 (McKinnon).) While Travelers argues that Mr. McKinnon's calculations were mistaken, such a determination was a credibility determina-

tion properly within the ambit of the jury. The jury rightly could have determined Mr. McKinnon's calculation to be credible. Therefore, the Court finds that the jury could have awarded Dr. and Mrs. Milhouse $24,531 in additional living expenses owed as a result of Travelers' breach of its coverage obligation.

### 4. Trees/Shrubs Coverage

Neither in its motion for judgment as a matter of law, nor in its motion for a new trial, did Travelers object that the jury could reasonably have found, based on the evidence, that it was in breach of its contractual obligation to provide coverage for "Trees/Shrubs" up to the policy limits. Neither party appears to contest that the evidence presented to the jury would allow for a finding that Travelers was obligated to pay up to the policy limits for trees/shrubs coverage, and that because it has not, it is in breach of its contractual obligations in the amount of $6,375. This sum is supported by the testimony of Mr. McKinnon. (*See* Aug. 19 Transcript, Vol. 2 at 104:22–105:5 (McKinnon).)

### 5. Ordinance or Law Coverage

■ The Travelers policy provided the Milhouses coverage of "up to ... 10 percent ... of the limit of liability that applies to [dwelling coverage] for the increased costs [the insureds] incur due to the enforcement of any ordinance or law." (Policy at 15.) Travelers argues that a plain reading of this clause requires that "a signed contract is required for the expense to be 'incurred,'" or become obligated to be paid. (Def.'s Mot. for New Trial at 7; *see also* Aug. 21 Transcript at 31:19–25 (Holland).) Because there was no evidence that the Milhouses had actually "incurred" any "Ordinance or Law" expenses, nor that they have "replaced their home, signed a contract to have it replaced, or even retained a contractor," Travelers con-

tends that they are not entitled to recover such benefits under the policy. To date, Travelers has not made any payments under the Ordinance or Law coverage. (*See* Def.'s Mot. for New Trial at 7.)

Contrary to Travelers' position, the jury was presented with testimony that the Milhouses had expended at least $75,000 towards rebuilding their home. (*See* Aug. 19 Transcript, Vol. 1 at 8:18–10:10 (C. Milhouse).) Dr. Milhouse testified that the money was spent paying for architect fees, soils engineers, and debris removal. (*Id.*) He further testified that he had been informed by the City of Yorba Linda that in order to rebuild the home, cassions would have to be built. (*Id.* at 9:11–19 (C. Milhouse).) Based on estimates he received, Mr. Milhouse projected that building cassions would cost at least $59,000. (*Id.* at 9:20–24 (C. Milhouse).)

Mr. Milhouse's testimony provides evidence upon which the jury could have relied to determine that the affirmative steps the Milhouses took towards rebuilding their home, taken together with Mr. Milhouse's knowledge, confirmed by Travelers, that he would not be permitted by the city to rebuild his home without building cassions, demonstrated an "obligation to pay" costs due to the enforcement of city code provisions. (*See* Aug. 19 Transcript, Vol. 2 at 20:19–22:16 (McKinnon).) Travelers' consultant, ACS, acknowledged that it would cost at least that amount to build cassions, and Mr. Hunt, its adjuster, confirmed to the Milhouses that such payments would be covered by the policy. (*See id.* at 20:19–22:16 (McKinnon).) The jury's award therefore reflected an inclusion in policy benefits for Ordinance or Law coverage. Accordingly, evaluating the testimony provided, the jury could have found in line with Mr. McKinnon's

view, that code upgrades would exceed the policy limits of $94,000. (*Id.* at 22:3–25 (McKinnon).)

## B. Dr. and Mrs. Milhouse's Special Damages

As noted above, given the evidence presented, the maximum recovery the jury could have awarded Dr. and Mrs. Milhouse under the policy was $674,634. Therefore, to reach a total breach of contract award of $1,949,634, the jury necessarily would have had to find that the Milhouses were entitled to $1,275,000 in special damages. That is, the jury had to find that as a direct result of Travelers' breach of its contractual obligations, Dr. and Mrs. Milhouse incurred an additional $1,275,000 of foreseeable special damages. The jury was instructed that Dr. and Mrs. Milhouse claimed these special damages only as "compensation for additional living expenses they have incurred and will continue to incur until their dwelling is replaced." (Jury Instr. No. 27.)

█ As an initial matter, the Court is satisfied that the jury reasonably could have found that Dr. and Mrs. Milhouse met their burden of proving that it was reasonably foreseeable at the time the policy was formed that if they were underpaid benefits to rebuild their home, they would incur additional living expenses beyond the policy limits. (*Id.* at No. 27.) Mr. Ballinger testified that Travelers was aware that Dr. and Mrs. Milhouse intended to rebuild their home, rather than take just the actual cash value of their policy limits and not rebuild. (*See* Aug. 13 Transcript at 100:11–101:1 (Ballinger).) However, because Travelers did not immediately pay the Milhouses the actual cash value of their home, the jury could infer that the Milhouses would have been unable to re-

build for lack of access to necessary funds.[7] Mrs. Milhouse herself testified of the family's inability to build their home due to lack of insurance funds. (Aug. 16 Transcript at 77:2–78:10 (P. Milhouse).) The Milhouses would therefore foreseeably need to incur additional living expenses, in particular to continue paying rent for alternate housing, even after their additional living expense benefits ran out. Given that the policy limits of additional living expenses were exhausted by about October 2010, (*see* Aug. 14 Transcript at 116:25–117:2 (Hunt)), the jury could have found that the Milhouses were entitled to additional benefits from that point until they were given a reasonable period of time in which to rebuild their home.

The Milhouse policy provides for approximately two years of additional living expenses. (*See* Aug. 14 Transcript at 116:25–117:2 (Hunt).) The expenses are provided to "cover any necessary increase in living expenses incurred by [the insured] so that [his or her] household can maintain its normal standard of living," and are paid for the time where insured acts to repair or replace his or her home. (Policy at 12.) In part then, the additional living expenses are paid to cover expenses to rent an alternative home during the course of repairs or replacement of the insured's home. For the Milhouses, the jury heard testimony that that fair rental amount for a house of like kind and quality to their lost home was approximately $6,700 per month. (Aug. 13 Transcript 207:1–207:14 (Ballinger); Aug. 16 Transcript at 49:7–50:1 (P. Milhouse).)

Based on such evidence, the jury could have determined that it was foreseeable that as a result of Travelers' breach of the policy's dwelling coverage, the Milhouses would continue to need approximately $6,700 per month after their additional living expenses coverage ran out. Because approximately 36 months passed between when the additional living expenses ran out and judgment was entered, the jury could have awarded additional living expenses beyond the policy limits for that period of time. The jury could additionally have found that from the point of judgment, the Milhouses should be entitled to an additional two years of coverage, the approximate amount of time their policy would cover additional living expenses, while they act to rebuild their home. Therefore, the maximum award the jury would reasonably be able to award the Milhouses for special damages beyond the policy limits is $402,000, or payment of $6,700 per month for 60 months.[8]

## C. Total Contract Damages

 Based on the above, the Milhouses were entitled to $674,634 for damages on the policy itself, and an additional $402,000 in special damages. Therefore, the maximum damage award supportable by proof is $1,076,634. The Milhouses may accept

7. In fact, there is no disagreement that until late 2010, nearly two years after the fire, the Milhouses had only received $602,000 in dwelling coverage benefits, less even than the $692,000 estimate Travelers' expert provided as the cost to rebuild the Milhouse home.

8. The Milhouses argue that the jury could have found that the Milhouses were entitled to special damages for additional living expenses of $144,000 per year for between five and eight years. (*See* Dkt. No. 388 ["Pls.'

Opp'n to Def.'s Mot. for JMOL"] at 7.) The $144,000 figure is unsupported by the evidence presented, and moreover, appears to include damages for living needs other than rent. While the Court finds that the Milhouses are entitled to special damages to pay their rent on another home while their lost home is being rebuilt, it does not find that the necessity of payment for other, non-rent-related expenses can be considered a foreseeable harm resulting from Travelers' breach.

this remitted amount, or otherwise, the Court will hold a new trial on the issue of breach of contract.

## III. Dr. and Mrs. Milhouse's Motion for a New Trial on Bad Faith

Dr. and Mrs. Milhouse move for a new trial on the issue of bad faith, arguing first that the Court erred in not charging the jury on several issues of law, including the legality of naming the IRS on payments to the Milhouses, and Travelers' definition of "actual cash value" in its insurance policy. The Milhouses also argue that as a result of admission of testimony at trial regarding a mediation proceeding between the parties, they were prejudiced as to the issue of bad faith.

### A. Substantial Evidence of No Bad Faith

 Before reaching the substance of Dr. and Mrs. Milhouse's motion for a new trial on bad faith, it is important to provide the contextual basis for the jury's finding. Substantial evidence was presented at trial that while Travelers did breach its contract with the Milhouses it did not act in bad faith in doing so. Instead, based on the evidence presented, the jury reasonably could have found that Travelers did not unreasonably delay in paying policy benefits.

Travelers presented significant evidence to show that its conduct in adjusting the Milhouses claim was not unreasonable or undertaken without proper cause. (*See* Jury Instr. No. 32.) For example, the jury heard testimony that by December 2008, within weeks of the fire, Travelers was attempting to correspond with the Milhouses about how best to send them an 80 percent advance on their dwelling coverage. (*See* Aug. 14 Transcript at 93:6–93:24 (Hunt).) The Milhouses did not respond to the inquiry. (*See id.*) By May 2009,

Travelers was still waiting for the Milhouses to provide them a response to the inquiry and, moreover, to provide a response to a questionnaire that would be necessary to determining the amount of money they were entitled to receive under the policy. (*See id.* at 96:3–96:13 (Hunt).) The response was provided in June 2009, (*see* Aug. 16 Transcript at 32:6–34:20 (C. Milhouse)), though even after that Travelers reported additional delays in obtaining follow-up responses. (*See* Aug. 14 Transcript at 96:3–96:13 (Hunt).) Similarly, with regard to settling the personal property coverage, Travelers sent a contents adjuster to California to assist the Milhouses in submitting their contents claim. (*See id.* at 103:15–106:2 (Hunt).) The Milhouses, however, did not meet with the adjuster or send a final contents claim until March 2012. (*Id.*)

The record is replete with other examples of Travelers' attempts to settle the claim, as well as with evidence of the Milhouses' own contributions to the delay in the adjustment process. While the evidence is certainly contested, after evaluating the complete record and the competencies of each witness presented to it, the jury had ample basis upon which to find that while Travelers did breach its contract with the Milhouses, the breach was not in bad faith.

#### 1. Jury Instruction on "Actual Cash Value"

As discussed above, Dr. and Mrs. Milhouse's dwelling coverage entitled them to recover the "actual cash value" of their dwelling. (Policy at 38.) The policy further defines actual cash value as "the amount it would cost to repair or replace covered property . . . subject to a deduction for deterioration." (*Id.* at 38.) The Milhouses argue that such a definition of actual cash value violates California law, and that the jury should have been in-

structed to that effect. The Court declined to offer the Milhouses' proposed instruction, and the Milhouses now argue that ·that decision constituted prejudicial error as to their bad faith claim. The Court disagrees.

■ The California Insurance Code provides that where a total dwelling loss has occurred, as happened to the Milhouses' property, actual cash value is determined by the fair market value of the structure—that is, the value of the property excluding the land on which the dwelling structure is situated—or the policy limits, whichever is less. Cal. Ins.Code § 2051(b)(1). The Insurance Code does not further define "fair market value."

Relying on the California Supreme Court's opinion in *Jefferson Insurance Co. v. Superior Court,* Dr. and Mrs. Milhouse argue that while the Insurance Code is silent on the definition of "fair market value," California courts have held that it can only be defined as "the price that a willing buyer would pay a willing seller, neither being under any compulsion to sell or buy." *Cheeks v. Cal. Fair Plan Ass'n,* 61 Cal.App.4th 423, 427, 71 Cal.Rptr.2d 568 (1998) (quoting *Jefferson Ins. Co. v. Superior Court,* 3 Cal.3d 398, 402, 90 Cal. Rptr. 608, 475 P.2d 880 (1970)). In *Jefferson,* the California Supreme Court interpreted the definition of actual cash value as used by the California Legislature in drafting the standard insurance policy form set forth in Insurance Code section 2701. The Court held that in the standard form insurance contract, actual cash value could not be interpreted to mean "replacement cost less depreciation." *Id.* at 402, 90 Cal.Rptr. 608, 475 P.2d 880. Because that is the definition of actual cash value used in their policy, the Milhouses argue that Travelers' adjustment of their home value by that formula was in violation of California law.

The Milhouses' argument is based on a misapplication of the California Supreme Court's holding in *Jefferson.* While the "willing buyer" definition of actual cash value is the default definition of fair market value in California, it is not the only available definition of the term. *See Sierra Pac. Power Co. v. Hartford Steam Boiler Inspection & Ins. Co.,* 665 F.3d 1166, 1171 n. 2 (9th Cir.2012). As California courts have explained, "[n]othing in *Jefferson* prevents the insurer and insured from *agreeing* to value damage to property on the basis of replacement cost less depreciation. The question in Jefferson was how the term 'actual cash value' should be interpreted in the *absence* of such an agreement." *Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.,* 92 Cal.App.4th 886, 894, 112 Cal.Rptr.2d 304 (2001) (quoting *Cheeks,* 61 Cal.App.4th at 430, 71 Cal. Rptr.2d 568); *see also Sierra Pac.,* 665 F.3d at 1171 n. 2 (acknowledging the ability of parties to contract around the default definition of actual cash value provided for in *Jefferson* ); Croskey, et al., Rutter Group Practice Guide: Insurance Litigation, Ch. 6B–G at 6:358.1 (2013) ("Policy may change definition of "actual cash value": The above statutory definitions [including section 2051] do not control where the policy defines "actual cash value" differently."). Nothing in the Milhouse policy suggests that they did not agree to contract around the default definition of actual cash value, and instead choose to be bound by the replacement cost less depreciation method of valuation. In fact, the language used in the Milhouse contract to define actual cash value, *see* (Policy at 38) ("Actual cash value is calculated as the amount it would cost to repair or replace covered property ... subject to a deduction for deterioration ...."), closely mirrors that language suggested by California courts as the appropriate means by which

to contract around the *Jefferson* default definition. *See Cheeks,* 61 Cal.App.4th at 430, 71 Cal.Rptr.2d 568 (noting that insurers can contract around the *Jefferson* default definition "by using words such as 'actual cash value, with proper deduction for depreciation'").

Because California law does not explicitly preclude parties to insurance contracts from contracting to define actual cash value in terms of replacement cost less depreciation, and because Travelers and the Milhouses contractually agreed to use the replacement cost less depreciation formula to define actual cash value, it would have been improper for the Court to instruct the jury as the Milhouses requested. It was for the jury to decide (1) whether in adjusting the Milhouses' claim, Travelers determined the appropriate actual cash value of the Milhouse home for breach of contract, and (2) whether in using the method that it did, Travelers acted in bad faith. Based on the evidence presented, the jury reasonably returned a verdict answering both questions in the negative.

### 2. Failure to Exclude Testimony Regarding Mediation Proceedings

At trial, evidence was presented regarding statements made during the course of the mediation proceeding between Dr. and Mrs. Milhouse and Travelers. In particular, testimony was presented that at the mediation, the Milhouses made a $7 million demand of payment and that they asked for nearly a million dollars of attorney's fees when their attorney had only worked on the case for a few weeks. (*See, e.g.,* Aug. 13 Transcript at 170:22–173:9 (Bal-

linger).) The Milhouses now challenge the admissibility of such evidence, and argue that it resulted in prejudicial error that warrants a retrial on the issue of bad faith. The Milhouses' argument fails on two independent grounds. First, the Milhouses failed to raise the issue with the Court at or before trial, and therefore waived their right to claim any privilege.[9] Second, to find evidence of statements made at the mediation proceeding inadmissible at trial would violate the due process right of Travelers to provide a complete defense to its alleged liability for bad faith and punitive damages.

#### a. Waiver

■ Under Federal Rule of Evidence 103, "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and[,] if the ruling admits evidence, a party, on the record[,] timely objects or moves to strike; and states the specific ground, unless it was apparent from the context." Fed.R.Evid. 103(a)(1). An objection is untimely unless it is "made as soon as the ground of it is known, or could reasonably have been known to the objector, unless some special reason makes its postponement desirable for him and not unfair to the offeror." 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037.1 (2d ed.2005) (citing John H. Wigmore, Code of Evidence 25 (3d ed.1942)). Rule 103's timely and specific objection requirement "serves to ensure that the 'nature of the error [is] called to the attention of the judge, so as to alert him [or her] to the proper course of action and enable opposing counsel to take corrective measures.'"

---

9. In their post-trial motions, the Milhouses attempt to establish that testimony about mediation communications should not have been admitted because Travelers and the Milhouses had signed a confidentiality agreement regarding the proceedings. (*See* Pls.' Mot. for New Trial at 8.) The argument obfuscates the fact that the Milhouses never presented their confidentiality agreement to the Court, and incorrectly assumes that the Court can exclude testimony on the basis of a confidentiality agreement it has never seen.

*Jerden v. Amstutz,* 430 F.3d 1231, 1236 (9th Cir.2005) (quoting *United States v. Gomez–Norena,* 908 F.2d 497, 500 (9th Cir.1990)), *opinion amended on denial of reh'g,* 04–35889, 2006 WL 60668 (9th Cir. Jan. 12, 2006).

The Milhouses now contend that California's mediation privilege barred the admission of the mediation statements. Their post-trial objection, however, is not timely.[10]

The Milhouses argue that their objection was timely because the issue of the admissibility of the parties' mediation statements was raised by the parties at the pre-trial conference on August 12, 2013. (*See* Dkt. No. 359 ["Aug. 12 Transcript"] at 37:9–39:12 (Pre–Trial Conference).) But the evidentiary question raised by the parties at the pre-trial conference was limited in scope to whether Travelers would be allowed to discuss that it offered to mediate the Milhouses' claim. The Milhouses took the position that Travelers should not be able to present such a fact to the jury. (*Id.* at 37:9–14 (Pre–Trial Conference).) After hearing brief argument, the Court held that "the fact that Travelers offered mediation in their handling of this claim is

not inadmissible." (*Id.* at 39:8–9 (Pre–Trial Conference).) The Milhouses' attorney acknowledged the scope of the Court's ruling, stating that he "understand[s] the Court's inclined to let the mention of the mediation take place. That's fine." (*Id.* at 39:10–12 (Pre–Trial Conference).)

The Milhouses now suggest that the Court's remarks during the August 12 pre-trial conference that the Rules of Evidence "seem[ ] to suggest even statements made and offers made which are inadmissible can be admissible if to rebut a claim of undue delay," (*id.* at 39:4–6 (Pre–Trial Conference)), constituted an affirmative ruling on the issue of whether statements made *during* the mediation would be admissible at trial. (Dkt. No. 402 ["Pls.' Reply in Supp. Mot. for New Trial"] at 3–4.) That broader question, however, was not before the Court. The Milhouses' objection was limited to whether Travelers would be allowed to present evidence that it offered to mediate the Milhouses' claim. In fact, at the pre-trial conference, the Milhouses never presented to the Court their objection that the California mediation privilege could make the parties' mediation statements inadmissible, nor was their objection apparent from the context.

---

**10.** The Milhouses' untimely objection presents a seemingly rare, but serious tension between the dictates of Federal Rule of Evidence 408 and Rule 501. Under Rule 501, in civil cases, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Because the Court exercises its diversity jurisdiction to apply California substantive law regarding breach of contract and bad faith, Rule 501 seemingly requires the application of California Evidence Code section 1119, the state's strict mediation privilege. *See Foxgate Homeowners' Ass'n, Inc. v. Bramalea Cal., Inc.,* 26 Cal.4th 1, 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117 (2001) ("To carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme ... unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception."). How-

ever, where, as here, a party to a diversity action in California seeks to introduce mediation statements for a purpose other than to prove or disprove the validity of a claim—for example, to show that its conduct was not taken in bad faith—there is a conflict between section 1119, applied through Rule 501, and Rule 408, which allows evidence of settlement negotiations to be admitted where offered not to prove liability, but to refute a claim of undue delay or bad faith. No court has considered this conflict in the context of an action brought solely through diversity jurisdiction. While the Court harbors doubts that the Federal Rules of Evidence intended themselves to be subordinated to the application of state evidence law, the question need not be resolved here given the Milhouses' waiver, and given the due process ground for the statements' admissibility, discussed below.

The Milhouses cannot now expand the scope of the Court's ruling to encompass an objection which they did not raise.

Broadly interpreted, the Milhouses' second ground for argument is that they moved the Court *in limine* to exclude testimony regarding the parties' mediation statements. (Pls.' Mot. for New Trial at 6; *see* Dkt. No. 98 ["Pls.' Mot. in Limine"].) However, the motion *in limine* to exclude testimony regarding mediation statements was voluntarily withdrawn by the Milhouses themselves, before the Court provided any ruling on the matter. (Dkt. No. 187.) Travelers' own motion *in limine* on the issue was similarly withdrawn. (Dkt. No. 193.) Neither party refiled a motion *in limine* on the subject, and any agreement they may have reached as to the admissibility of mediation statements was not presented to the Court. The Milhouses' voluntarily withdrawn motion *in limine* cannot then constitute a timely objection for purposes of Rule 103.

Finally, the Court notes that even during trial, when the contents of the mediation proceedings were first directly inquired about by Travelers on the cross-examination of Joseph Ballinger, the Milhouses objected first on hearsay grounds, and then on grounds that the testimony lacked foundation. (*See* Aug. 13 Transcript at 168:14–169:3 (Ballinger).) Because adequate foundation had been laid for the testimony, and because the statements were offered for their effect on the listener, the Court overruled the Milhouses' objections. At no point during trial did Plaintiffs object on grounds that the contents of the mediation proceeding were privileged, nor was such an objection apparent from the context at the time of the Milhouses' speaking objections. (*See id.*) The same was true every other time Travelers sought to introduce testimony reveal-ing the parties' mediation statements. The Milhouses' argument that raising such an objection would have been "futile" because the "Court advised counsel that these inadmissible statements could be presented at trial" is unavailing. (*See* Pls.' Reply in Supp. Mot. for New Trial at 5). As noted above, the issue of privilege was never raised with the Court. *See* Fed. R.Evid. 103(a)(1)(B) (providing that a party must state the *specific* ground for their objection to the admissibility of evidence, or it must be apparent from the context of their timely objection). The Milhouses' failure to object to disclosure of the parties' mediation statements, either at or before trial, therefore waived their ability to raise the objection post-trial.

### b. Admissibility of Mediation Statements

 Even if the Milhouses had timely objected to the admissibility of the parties' mediation statements, the Court would have overruled their objection. Due process demanded that the Court allow the jury to hear the testimony regarding the parties' mediation statements.

The Milhouses argued extensively at trial that Travelers, "unreasonably or without proper cause, failed to pay or delayed payment of policy benefits." (*See* Jury Instr. No. 33.) More specifically, the Milhouses contended that Travelers acted in bad faith by refusing to settle their claim. This bad faith theory was asserted at the very beginning of the trial. In his opening statement, the Milhouses' attorney stated:

> The parties go on for a period of years trying to settle the case. Nothing is getting done. In June of 2010, Travelers is put on notice by the Milhouse's lawyer ... that it's time to pay the claim. A letter is sent to [Travelers] saying ... pay the policy limits. Send the check with interest for what you owe. [The Milhouses] don't want to

sue.... Settle the claim. You'll find that this was met with resistance and an insistence on using an improper system. So the Milhouses met with Travelers, tried mediation. That failed. They sued Travelers. And when they sued Travelers, Travelers didn't say they were sorry. They didn't offer to pay the money.

(Aug. 13 Transcript at 64:18–65:6 (Milhouse Opening).) During the trial, the Milhouses' attorney aggressively questioned Travelers' witnesses on the issue. For example, on direct examination, Travelers' general adjuster Mr. Ballinger, the first witness at the trial, was asked several questions by the Milhouses' attorney that suggested Travelers was unreasonably refusing to settle the Milhouses' claim:

> The only person that had authority to settle the claim, according to the folks [the Milhouses] have talked to so far, was Richard Sweeney.... [D]id you ever see any indication that Mr. Sweeney ever attempted to meet with the Milhouses or their representatives to settle this claim? ... Did you ever see anybody do that until after October 2010 when we had the mediation and the lawsuit?

(Aug. 13 Transcript at 117:23–118:9 (Ballinger).) At one point, the Milhouses' attorney pointedly asked Mr. Ballinger:

> [I]s it unreasonable for Travelers not to have someone with authority to sit down with the Milhouses? ... The reasonable thing to do would have been to do that, right? To meet with the Milhouses to try to settle the claim?

(*Id.* at 203:8–17 (Ballinger).) The Milhouses' attorney was relentless in his questioning. (*See, e.g.,* Aug. 14 Transcript at 13:18–17:20 (Hunt); Aug. 15 Transcript at 11:13–15 (Schaeffer); Aug. 16 Transcript at 224:5–226:9 (P. Milhouse); Aug. 19

Transcript, Vol. 1 at 168:2–170:3 (McKinnon).)

Then, in closing arguments, speaking of the need to impose punitive damages upon Travelers, the Milhouses' attorney emphasized to the jury the premise underlying the Milhouses' claim for bad faith:

> "Cooperation.... With who? Working with Travelers is the sound of one hand clapping. They're not here. Cooperation is a two-way street. And the one with no hand up is Travelers. The one with the obligation under the [C]ode to have a hand up and help you out."

(Aug. 22 Transcript, Vol. 2 at 88:2–8 (Milhouse Rebuttal).)

For the Milhouses, the case was one about a despicable insurance company that had a policy of not fairly and reasonably cooperating with its insureds to settle their claims after tragic loss. They now argue that the Court erred by allowing the jury to hear the parties' mediation statements. The Milhouses are wrong. Travelers needed to present the parties' mediation statements to provide a complete defense of its actions and to avoid paying millions of dollars in bad faith and punitive damages for wrongfully refusing to settle the Milhouses' claim.

Up to the point of the mediation, the parties knew that they had differences in their estimates of how much the Milhouses were owed under the policy. Throughout the trial, the jury would hear about these differences, and the varying assumptions made by Travelers and by the Milhouses about how to value their home, and about how to value other coverages under the policy. What the jury could not understand without hearing the parties' respective mediation statements, however, was why, despite these differences, the parties could not reach a reasonable settlement of the claim. The parties' mediation statements provided an answer for the jury. It

was not Travelers who acted unreasonably in settling the claim. Sadly, it was the Milhouses. They demanded way too much money to settle their claim.

On cross-examination, and in testimony that was, for the most part, not substantively disputed by the Milhouses,[11] Mr. Ballinger explained to the jury that as Travelers prepared for the mediation, it understood that they were about $500,000 apart from the Milhouses on settlement of the claim. (*See* Aug. 13 Transcript at 170:1–3 (Ballinger).) Travelers therefore offered "a couple hundred thousand dollars" to settle the claim. (*See id.* at 171:15–18 (Ballinger).) The Milhouses' attorney had a very different number in mind: $7 million. (*See id.* at 169:3 (Ballinger).) Of that, $800,000 to $1 million was accounted for by fees to be paid to the Milhouses' attorney, who at that point had been on the case for about six weeks. (*See id.* at 170:22–173:9 (Ballinger); *see also* Aug. 16 Transcript at 109:18–110:21 (P. Milhouse).) When the Milhouses' moved from their demand, it insisted that Travelers commit to paying in a range between $1 million and $5 million. (*See* Aug. 13 Transcript at 170:8–10 (Ballinger).) Travelers would not acquiesce to the Milhouses' demand. (*Id.* at 170:13–15 (Ballinger).)

Following the mediation, and throughout the trial, the parties remained several millions of dollars apart on settling the claim. In his closing arguments, the Milhouses' attorney summarized for the jury what he believed Travelers owed for not settling the claim: "The amount of money you need to put for the bad faith damages on the jury sheet . . . is $8,325,860." (Aug. 22 Transcript, Vol. 1 at 62:2–8; 63:1–11) (Mil-

house Closing Argument).) Then, he continued, because Travelers' conduct was so reprehensible, punitive damages were required: "The very least you can award in punitive damages for this company [is] . . . $9,079,182." (*Id.* at 63:1–11) (Milhouse Closing Argument).) The jury rejected the suggestions and recommendations of the Milhouses' attorney, finding no bad faith on the part of Travelers and imposing no punitive damages whatsoever.

It was entirely proper for Travelers to present the parties' mediation statements to the jury. The evidence presented at trial clearly demonstrated that Travelers did not settle the Milhouses' claim because of the positions that were taken during and after the mediation by the Milhouses and their attorney. The jury therefore needed to hear all about what happened during and after the mediation so it could determine whether Travelers did in fact act unreasonably, maliciously, fraudulently, or oppressively by refusing to settle the Milhouses' claim. To exclude this crucial evidence would have been to deny Travelers of its due process right to present a defense. *See Cassel v. Superior Court*, 51 Cal.4th 113, 119, 119 Cal.Rptr.3d 437, 244 P.3d 1080 (2011) ("We must apply the plain terms of the mediation confidentiality statutes to the facts of this case *unless* such a result would violate due process, or would lead to absurd results that clearly undermine the statutory purpose.") (emphasis added); *cf. Solin v. O'Melveny & Myers, LLP*, 89 Cal.App.4th 451, 465–66, 107 Cal. Rptr.2d 456 (2001) ("It strikes us as fundamentally unfair for a client to sue a law firm for the advice obtained and then to

---

**11.** At trial, both Dr. and Mrs. Milhouse testified that they did not have any specific recollection about the settlement demands they made to Travelers at the mediation. (*See* Aug. 16 Transcript at 104:4–107:14 (P. Milhouse); Aug. 19 Transcript, Vol. 1 at 21:23–

23:23 (C. Milhouse).) However, the "ball park" estimations provided by Ms. Milhouse do not contest Mr. Ballinger's testimony. (*See* Aug. 16 Transcript at 106:20–107:14 (P. Milhouse).).

seek to forbid the attorney who gave that advice from reciting verbatim, as nearly as memory permits, the words spoken by his accuser during the consultation. Simple notions of due process counsel against such a procedure.").

## CONCLUSION

For two weeks, the jury sat and listened to testimony and viewed evidence regarding Travelers' conduct in adjusting the Milhouses' insurance claim on the loss of their home in a tragic fire. With the exception of the amount of damages awarded for breach of contract, the verdict it returned was supported by substantial evidence. The Court therefore upholds the jury's verdict that while Travelers did breach its contract with the Milhouses, it did not act in bad faith in doing so. Travelers' motion for judgment as a matter of law, and the Milhouses' motion for a new trial on bad faith are therefore DENIED.

The Court does, however, GRANT Travelers' motion for remittitur, or in the alternative a new trial. The jury's damage award was excessive with regard to the special damages available to the Milhouses. The total damages award for breach of contract is remitted to $1,076,634. The Milhouses must notify the Court of their acceptance or rejection of the remitted award by November 15, 2013. Should they reject the award, a new trial will be held on breach of contract as soon as can be reasonably scheduled, in consideration of the Court's and the parties' calendars.[12]

---

12. Because of the Court's grant of remittitur, or in the alternative a new trial on breach of contract, it is unnecessary to reach the question of the Milhouses' entitlement to prejudgment interest. That motion is DENIED WITHOUT PREJUDICE. The Milhouses' may move for prejudgment interest again after judgment is re-entered in this matter.