Filed 7/22/16  Frymer v. Hollins Law CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DAVID FRYMER et al., | B267213 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC532875) |
| v. | |
| HOLLINS LAW et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Theresa Sanchez-Gordon, Judge.  Reversed and remanded.

Law Offices of Martina A. Silas and Martina A. Silas, for Plaintiffs and Appellants.

Nemecek & Cole, Jonathan B. Cole, Claudia L. Stone, and Mark Schaeffer, for Defendants and Respondents.

_____

In this malicious prosecution action, David Frymer and Frymer Development, Inc. (respectively "Frymer" and "Frymer Development") appeal from an order granting the anti-SLAPP motion of respondent law firm, Hollins Law, and attorneys Andrew Hollins, Braden Bennett, and Scott Monroe. Appellants have made the requisite showing that respondents prosecuted an earlier lawsuit for fraud and negligent misrepresentation against appellants without probable cause and with malice.[1] We reverse the order and remand the case for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

On May 2, 2005, non-parties Palazzo Margot, LLC (also known as Wilshire Margot, LLC; hereafter, "Wilshire") and Taisei Construction Corporation (hereafter, "Taisei") entered into an agreement, under which Taisei was to construct an apartment building on Wilshire Boulevard in Westwood. The agreement was signed by Neil Shekhter, as Wilshire's manager, and Emery Molnar, Taisei's Senior Vice President. Frymer, the president of Frymer Development, had known Shekhter since about 2001, and Frymer Development was separately retained to monitor the progress of construction as Wilshire's agent on site. The project resulted in complex litigation, consisting of numerous related and consolidated lawsuits, which were settled globally in 2013.

As relevant here, in March 2009, Taisei, represented by Castle & Associates, sued Wilshire for breach of contract, quantum meruit and account stated, alleging Wilshire had asserted "arbitrary and groundless offsets and liquidated damage claims" and had failed

---

[1] We take judicial notice of our decision in *Frymer v. Castle & Associates* (Feb. 5, 2016, No. B262022 [unpub. opn.]), where we reversed the order granting the anti-SLAPP motion of Castle & Associates and attorneys Nomi Castle and Matthew Luce (hereafter, collectively "Castle & Associates"). There, we found that appellants had made a sufficient showing that the underlying case was initiated and prosecuted against them without probable cause and with malice. Respondents were not parties to appellants' earlier filed appeal against Castle & Associates because appellants objected to the consolidation of the two appeals. Hence, our previous decision is not law of the case as to respondents, and we determine all issues anew as to them. (See *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57.)

2

to pay Taisei fully for labor and materials, timely process Taisei's change order requests for payment, and release retention proceeds. In April 2009, Wilshire filed a cross-complaint (in a related case) for contractual fraud, breach of contract, and negligence against Taisei and other defendants. The cross-complaint, which was amended several times, alleged numerous construction defects.

In October 2010, Taisei amended its complaint to assert additional claims for fraud and negligent misrepresentation. As to fraud, it alleged that Wilshire withheld payment on "sham grounds." Shekhter, his entity NMS Properties, as well as appellants and unnamed DOE defendants were alleged to have "aided and abetted" Wilshire in "fabricating" those grounds. Wilshire was alleged to have made the following four fraudulent promises: 1) that it would compensate Taisei in full for the construction project, including any delays and disruptions; 2) that it would promptly release amounts retained during construction; 3) that it would abide by the cost specifications attached to change order no. 16, signed on December 29, 2005; and 4) that it would not hinder the timeliness of the project when it took over the glass and glazing subcontract by change order no. 67, signed on August 28, 2006. Shekhter and NMS Properties, who were named as Wilshire's alter egos, were alleged to have aided and abetted Wilshire in defrauding Taisei by making the same four promises, as Wilshire's "managing agents." The promises also were attributed verbatim to appellants, who were named as alter egos of each other and as Wilshire's "construction manager" and "managing agents." The same four promises formed the basis for the claims of negligent misrepresentation asserted against all defendants.

Castle & Associates represented Taisei until April 2012, when Hollins Law substituted in as Taisei's new counsel. Respondents represented Taisei as plaintiff and served as *Cumis* counsel for its defense against Wilshire's cross-claims. (See *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358, 361; Civ. Code, § 2860 [insurer required to provide independent counsel to insured in case of conflict of interest].)

3

Appellants' counsel, Martina Silas, promptly told attorney Hollins that Taisei's claims against appellants lacked merit and urged that he investigate them. She repeatedly advised attorney Bennett of the same. In August 2012, in response to Bennett's request for an explanation, Silas wrote that the allegations of fraud in the complaint were factually insufficient and suspicious on their face because they attributed the same promises to multiple parties; yet, no witness had identified any false promise made by appellants. Silas cited caselaw supporting her position that the claims were legally insufficient because they improperly recast the cause of action for breach of contract as a tort claim, and because appellants could not be liable on a theory of conspiracy to commit fraud as agents of a disclosed principal.

By the time respondents took over Taisei's representation, Frymer already had been deposed twice by other parties in this complex litigation. His deposition resumed on July 23 and 24, 2012. On the latter date, Bennett was allowed to question Frymer out of order regarding appellants' compensation as Wilshire's agent on the project. Frymer's response was that their billings were modest and they received no bonus for their services. Bennett questioned Frymer again during the sixth session of his deposition, on October 19, 2012. Frymer explained that his father had introduced him to Shekhter and they had worked on construction projects together. He understood an owner's agent to be "the eyes and ears of the owner who can relay information to the owner of interacting with . . . the general contractor on the job." Frymer denied that Shekhter consulted with him regarding the guaranteed maximum price on the contract, explaining that Shekhter consulted with an attorney on that matter. Frymer explained that he answered Shekhter's questions regarding some change orders. He specifically remembered discussing a "window change" order, a "civil change" order involving elevation issues, and an "elevator shaft" order.

Bennett did not ask follow-up questions relevant to change orders nos. 16 and 67. He pursued lines of questions apparently unrelated to Taisei's complaint, and he moved to strike Frymer's response that many of the change orders appeared to be excessive and improper. Frymer expressed his frustration with the slow pace of the deposition, during

4

which Bennett's questions were constantly interrupted by objections and comments from many of the attending attorneys, including Silas. At some point, Silas announced that if the deposition could not be completed in another session, she would seek a protective order. After that, Silas canceled two deposition sessions, but she eventually produced Frymer for additional sessions on December 5 and 7, 2012. The portion of the first of these sessions included in the record on appeal shows that Bennett asked Frymer questions about parking on the project, as well as invoices for food and T-shirts. No substantive portion of the latter deposition session appears in the record.

In October 2012, appellants propounded a set of 35 special interrogatories, requesting disclosure of the specific facts, witnesses, and documents supporting Taisei's claims that appellants had made promises to Taisei and had aided and abetted Wilshire in fabricating grounds for nonpayment. In November, respondents submitted Taisei's responses, which were verified by its vice president, Richard Aman. The response to each interrogatory was the same. After a series of objections, Taisei conclusorily stated that appellants "worked hand-in-hand" with Shekhter to "fabricate sham grounds for non-payment in order to get the project at an ill-begotten discount." The remaining portion of the response listed Taisei's complaints that Wilshire claimed the building was not "substantially complete" despite the fact that it had been occupied for more than four years, that Wilshire bore the risk of delay on window installation, and that it refused to pay on change orders signed by Shekhter. The response concluded with the claim that discovery was ongoing and Frymer's deposition had not been completed.

At some point, appellants offered to waive fees and costs and any malicious prosecution claims in exchange for a dismissal of the fraud claims against them. In late November 2012, they agreed to keep the offer open until December 12, but Taisei did not accept it by that date. In his deposition on December 19, Molnar testified that he negotiated the construction agreement on behalf of Taisei, and although Frymer attended one meeting during negotiations, he did not make any promises. Molnar denied having told anyone at Taisei, or having been told by anyone, that Frymer had made any misrepresentations; he was unaware that appellants had been sued for fraud.

5

On December 20, 2012, Bennett notified Silas that Taisei was willing to dismiss appellants "for a waiver of costs, fees, and any malicious prosecution." Silas responded that appellants' offer to waive costs, fees, and any claim for malicious prosecution had expired on December 12, after remaining open for nearly two months, and that she was working on motions for sanctions and summary judgment. On December 27, Silas confirmed that there would be no settlement. Instead, appellants filed a motion for sanctions against Taisei and its counsel for prosecuting a meritless action against appellants (Code Civ. Proc., § 128.7, subds. (b) & (c)), as well as a motion for summary judgment. (*Id*., § 437c.) Once again, appellants argued the claims against them were legally and factually insufficient. Specifically, appellants relied on Taisei's responses to special interrogatories, which failed to identify any witness to whom appellants made any representations. Appellants also cited to Molnar's deposition testimony that Frymer had made no promises or misrepresentations during contract negotiations.

On January 10, 2013, Hollins wrote Silas to request that appellants withdraw the motion for sanctions. He argued that Molnar's testimony did not exculpate Frymer of aiding and abetting Wilshire in fabricating grounds for nonpayment. He rejected appellants' reliance on the agent immunity rule, claiming that Taisei had evidence of a common plan between Frymer and Shekhter to commit fraud and Frymer was liable for his wrongful "acts and omissions," whether or not he had benefitted from them.

The only factual support cited for these accusations was Aman's expected testimony that Frymer had sat in silence at a meeting during which Shekhter had complained about having been "tricked" into signing change order no. 16 and having "had no way of knowing the implications of what he signed." Hollins cited to Frymer's November 28, 2005 email to Shekhter, warning Shekhter that Taisei would "force" him to sign a change order and recommending that he consult with an attorney. According to Hollins, the email showed Frymer knew Shekhter had not been "tricked," and Frymer's silence at the meeting furthered the conspiracy to defraud Taisei.

Hollins excused Taisei's delay in accepting appellants' offer as reasonably necessary to evaluate the evidence, and he insisted Taisei continued to believe in good

6

faith that it could prevail against appellants at trial. He concluded the letter by conceding that Taisei's case was primarily against Shekhter and Wilshire. Nevertheless, he asked Silas if she "truly" wanted Taisei "to now focus primarily on Frymer (and by way of your motion and refusal to settle) expose your own client to additional exposure and make us bring all facts and arguments to the forefront of this litigation for the client and all counsel to see? I thought your goal was to get the fraud allegations out of the public eye and help your client so he could stop disclosing it and having it affect his business?" Hollins then urged Silas to discuss with appellants Taisei's offer to dismiss them "for a waiver of costs, fees, and any claim of malicious prosecution." Silas did not respond.

Five days later, on January 15, 2013, Hollins, on behalf of Taisei, dismissed the first amended complaint against appellants without prejudice. In May 2013, the parties to the complex litigation settled their remaining claims. Under the terms of the settlement, an insurer, on behalf of Wilshire, paid Frymer Development $180,000 "for defense costs and fees related to the [a]ctions," which included Frymer Development's cross-complaint for indemnity against Wilshire based on a subcontractor's claim. Wilshire received $18 million, of which it paid Taisei $301,000. The settlement included mutual releases, but specifically excepted any claims by appellants for malicious prosecution against Taisei's counsel arising from Taisei's complaint against appellants. In July 2013, Taisei dismissed the first amended complaint with prejudice.

In January 2014, appellants brought this malicious prosecution action against Castle & Associates and respondents. The court initially granted respondents' anti-SLAPP motion on a ground they had advanced for the first time in their reply brief: that the underlying lawsuit had been settled and therefore did not terminate in appellants' favor. The court later reversed its ruling and reset the motion for a hearing. In their reply to appellants' renewed opposition, respondents expressly withdrew their argument that the underlying case had not terminated favorably to appellants for purposes of the anti-SLAPP motion.

Respondents' motion reiterated the arguments Hollins had made in his January 10, 2013 letter to Silas: that Molnar's testimony was not dispositive because respondents had

probable cause to believe that Frymer had been involved in the review and approval of change order no. 16, which revised the final guaranteed maximum price of the contract, and "misrepresentations may have been made by Frymer during these negotiations." In his declaration, Bennett also mentioned the allegation in the first amended complaint that "Frymer engaged in misconduct during communications" about the delay in payment related to window installation, but respondents did not rely on this allegation in their motion and provided no factual support for it. Respondents contended appellants recognized their need for time to fully investigate the fraud allegations before recommending dismissal because they kept their offer to waive fees, costs, and malicious prosecution claims open for two months, and the fraud claims were dismissed shortly after the offer expired.

Alternatively, respondents argued that appellants' malicious prosecution case against them should be dismissed because Taisei had not waived its attorney-client privilege, which precluded respondents from presenting evidence of any of their communications with Taisei. They offered the declaration of Jaysen Van, Taisei's Operations Risk Manager, who stated he and respondents had discussed Taisei's claims against appellants, but those discussions were privileged, and Taisei did not intend to waive its privilege.

In opposition, appellants argued respondents had failed to identify any document or witness supporting the fraud claims against appellants. They relied on the testimony of Molnar, who negotiated the original contract and change order no.16, and Scott Griggs and Doug Holmes, who signed change order no. 16 on behalf of Taisei, as evidence that Frymer had not been involved in any contract negotiations with Taisei and had made no misrepresentations. Appellants pointed out that the project was undisputedly riddled with defects, for which Wilshire eventually received $18 million in settlement. They noted that respondents continued to insist the fraud claims against appellants had merit despite having been repeatedly warned the claims were frivolous, and despite Taisei's inability to identify any evidence supporting those claims in its discovery responses. Appellants contended that the evidence relevant to their malicious prosecution case was not

8

privileged because the facts on which Taisei's claims against appellants were based should have been disclosed during discovery in the underlying case, and it would be unfair to allow respondents to avoid liability by hiding behind the attorney-client privilege.

The parties exchanged numerous relevance objections. Appellants also objected that their offer to settle was inadmissible under Evidence Code sections 1119, 1152, 1154. In September 2015, the court overruled all evidentiary objections and granted respondents' motion on the single ground that appellants failed to show respondents had prosecuted the underlying case against them with malice. The court agreed that there was no evidence supporting the allegations in Taisei's first amended complaint, but it found that the lack of evidence became apparent only at Molnar's deposition in December 2012. The court cited to the ongoing discovery and settlement discussions to conclude that respondents acted reasonably in promptly dismissing the claims against appellants after the holiday season was over. The court allowed respondents to file a motion for attorney fees and costs and did not consider appellants' motion for fees and costs under the anti-SLAPP statute. (Code Civ. Proc., § 425.16, subd. (c)(1).)

This appeal followed.

## DISCUSSION

### I

Under the anti-SLAPP statute, a cause of action arising from a defendant's act in furtherance of a constitutionally protected right of free speech may be stricken unless the plaintiff is likely to prevail on the merits. (Code Civ. Proc., § 425.16, subd. (b)(1).) We review an order granting an anti-SLAPP motion to strike de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We accept as true the evidence that favors appellants and evaluate respondents' evidence "'only to determine if it has defeated that submitted by [appellants] as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).) Appellants' action need have only "'minimal merit' [citation]" to survive an anti-SLAPP motion. (*Id*. at p. 291.)

9

A malicious prosecution action falls within the purview of the anti-SLAPP statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735.)  To prevail on the merits of such an action, appellants must demonstrate that the underlying case against them "(1) was commenced by or at the direction of the defendant[s] and was pursued to a legal termination favorable to [appellants]; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 292.)  They also may prevail by showing that respondents maliciously continued to prosecute the case against them without probable cause.  (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 969, 973.)

The only contested elements of malicious prosecution are probable cause and malice.[2]  Before we turn to them, we address respondents' alternative argument that appellants' claims are barred by the attorney-client privilege and should be dismissed. Respondents argue that the malicious prosecution action should be dismissed because the attorney-client privilege precludes them from defending against the allegations that they prosecuted the underlying case against appellants without probable cause and with malice.  While respondents may raise this argument as an alternative basis for affirming the trial court's order, we are not persuaded that the privilege requires a summary dismissal at this stage of the proceeding.

Dismissal is a drastic measure that applies only in the rare case that, by its nature, requires the defendant to disclose privileged information highly material to the defense, and where it would be unfair to allow the plaintiff to proceed with the lawsuit.  (*Dietz v.*

---

[2] Respondents invite us to affirm the court's order because appellants have not shown that the underlying case terminated favorably as to them.  Appellants address the issue in a cursory fashion since the trial court ultimately resolved it in their favor, and respondents expressly withdrew the issue from further consideration for purposes of the anti-SLAPP motion.  Appellants' burden on appeal is to show error (*Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 383), not to reargue rulings favorable to them on issues that apparently were no longer contested at the anti-SLAPP stage of the proceeding.  Respondents may raise errors on appeal in order to show that appellants were not prejudiced by the errors they assert as grounds for reversal.  (See Code Civ. Proc., § 906; *Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1671.)  However, respondents present no substantive argument on the issue of favorable termination, and we decline to treat that issue as contested for purposes of this appeal.

10

*Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 792–794 (*Dietz*).)  For example, a shareholder derivative action for legal malpractice against outside counsel cannot proceed if the non-party corporation does not waive its privilege over the communications alleged to constitute a breach of that counsel's duty to the corporate client.  (*McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378, 385.)  Similarly, a legal malpractice action for negligent advice given after a single consultation cannot proceed if outcome determinative communications made during the consultation are protected by a non-party's attorney-client privilege.  (*Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 461, 463 (*Solin*).)  It would be inherently unfair to allow "a plaintiff to bring a claim, which, by its very nature necessitates a defense based on confidential information, where the plaintiff has either directly supplied such confidential information to the defendant, as in *Solin*, or where the plaintiff seeks to derivatively represent a third party who has supplied such information to the defendant, as in *McDermott*."  (*Dietz*, at p. 793.)

Respondents offer no authority that malicious prosecution cases against attorneys are inherently unfair, or that in this case appellants supplied any of the confidential information on which defendants rely.  The California Supreme Court has suggested that a settlement agreement releasing the client without also releasing the client's attorneys from a claim of malicious prosecution may raise public policy concerns because it may preclude the attorneys from successfully defending against such a claim if the client refuses to waive the attorney-client privilege.  (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 745, fn. 7.)  But the court did not hold that a malicious prosecution case against counsel following such a one-sided agreement was subject to automatic dismissal.  (*Ibid*.)  Indeed, to avoid gamesmanship, the attorney-client privilege should not be allowed to bar a legitimate claim for malicious prosecution unless the substance of the privileged communications can be reliably ascertained to be highly material or outcome determinative.  (See *Dietz*, *supra*, 177 Cal.App.4th at pp. 793–794.)

Typically, "whether the privilege serves as a bar to the plaintiff's recovery will be litigated and determined in the context of motions for protective orders or to compel further discovery responses, as well as at the time of a motion for summary judgment."

11

(*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190; see *Solin*, *supra*, 89 Cal.App.4th at p. 460 [parties entered into protective order regarding handwritten notes which showed that outcome determinative privileged third-party client information was disclosed during initial consultation].)  Appellants have had no opportunity to discover the factual underpinnings of respondents' assertions that their communications with Taisei contain material privileged information.  They are rightfully suspicious of representations made for the first time in respondents' brief on appeal— that respondents relied on information provided by Molnar and that they threatened to withdraw as counsel unless Taisei dismissed the claims against appellants—as those representations contradict non-privileged evidence in the record.  We cannot determine the credibility of respondents' factual representations on appeal from an order granting an anti-SLAPP motion.  (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

Generally, the trial court may protect privileged information by employing various measures, such as "[t]he use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings."  (*General Dynamics Corp. v. Superior Court*, *supra*, 7 Cal.4th at p. 1191.)  The trial court "should employ those same measures before dismissing the claim of a plaintiff who, as [appellants] in this case, can establish his or her claim without resort to confidential information, but who faces a defendant that contends that it cannot mount a defense without disclosing such information."  (*Dietz*, *supra*, 177 Cal.App.4th at p. 793, fn. 11.)  It is clear that the trial court did not consider respondents' request for dismissal based on the attorney-client privilege, and, as we shall explain, the record on appeal does not show that respondents' communications with Taisei are outcome determinative as a matter of law, or that respondents are absolutely prevented from defending against appellants' claims without disclosing those communications.  We decline to affirm the dismissal based on the attorney-client privilege.

12

## II

We next review the parties' respective showings on the issues of probable cause and malice. We do not weigh credibility, or compare the weight of the evidence, but view all evidence in favor of appellants as the parties opposing the anti-SLAPP motion. (*Flatley v. Mauro*, *supra*, 39 Cal.4th at p. 326.)

### A. Probable Cause

Probable cause to prosecute an action exists when the action is based on facts reasonably believed to be true, and all asserted theories are legally tenable. (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

### 1. Factual Tenability

Respondents represent that they relied on information provided by Taisei, which they cannot disclose because it is protected by the attorney-client privilege. But while an attorney may be entitled to rely on a client's factual statements "in the first instance," that reliance does not insulate the attorney from liability for continuing to prosecute an action in which the client fails to disclose "any witnesses, documents, or other evidence in support of [its] allegations." (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 224 (*Daniels*) [finding prima facie showing of lack of probable cause to prosecute defamation action where plaintiff refused to cooperate in discovery in that action].)

Neither Taisei's discovery responses in the underlying case nor respondents' communications with appellants' attorney on behalf of Taisei are privileged. (*Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1498 ["privilege only protects disclosure of communications, it does not protect disclosure of the underlying facts by those who communicated with the attorney"].) The interrogatory responses disclose nothing more than an unsupported conclusion that appellants helped Shekhter come up with false reasons to deny payment. They suggest that the claims against appellants lacked a factual basis. (See *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580–581 [factually devoid answers to interrogatories are sufficient to make initial showing that claim lacks merit].)

13

Despite acknowledging that there was massive discovery during the complex litigation, respondents offer no evidence substantiating their claims that appellants made misrepresentations regarding the contract, or change orders nos. 16 and 67. To the extent they insinuate that Taisei privately communicated facts not disclosed in discovery, those assertions conflict with other evidence in the record and cannot be credited at the anti-SLAPP stage, where we must accept as true all evidence favorable to appellants. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) For instance, respondents' suggestion in their brief on appeal that Molnar had given them information contradicting his deposition testimony is at odds with Molnar's denial at his deposition that he had told anyone that Frymer had made any misrepresentations during contract negotiations.

As respondents note, Taisei waived its privilege as to communications with Castle & Associates, but not as to communications with respondents. Assuming this partial waiver does not defeat the privilege as to communications with respondents (see *Lohman v. Superior* Court (1978) 81 Cal.App.3d 90, 97), the communications disclosed by Castle & Associates reveal nothing more specific than a vague suspicion (unattributed to any particular corporate representative) that Frymer Development was owned or controlled by Shekhter, and that appellants were somehow complicit in Wilshire's denial of payment on change order no. 67. It begs the question why Taisei would not have revealed any more specific information to its original counsel, or to appellants, if it indeed had such information.

Respondents have not attempted to support the allegations regarding change order no. 67, which is not in the record. Their attempt at supporting the allegations regarding change order no. 16 is insufficient. There is no evidence Aman ever said that Frymer sat in silence during a meeting at which Shekhter claimed he had been "tricked" into signing change order no. 16. Even assuming Aman privately told respondents something to that effect, there is no evidence supporting respondents' conclusion that Frymer was privy to any more information about Shekhter's claim that he was "tricked" than was Taisei. In his November 28, 2005 email, Frymer advised Shekhter to seek legal counsel, but Shekhter did not sign change order no. 16 until a month later, on December 29, 2005.

14

Nothing in the email suggests Frymer encouraged Shekhter to sign the change order with the intent to breach it later, and the record is devoid of evidence that Frymer was involved, or knew what transpired, in the subsequent negotiations of this change order. On the record before us, respondents' conclusions that Frymer knew Shekhter was not "tricked" into signing the change order and that he knew Shekhter signed the order without intending to honor its terms are speculative.

"In a malicious prosecution case where the issue is the insufficiency of the facts known to the defendant, 'probable cause requires evidence sufficient to prevail in the action or at least information reasonably warranting an inference there is such evidence.' [Citation.] To be reasonable, an inference ""'cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.'"" [Citation.]" (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1113.) Viewed in appellants' favor, the record on appeal supports a prima facie case that respondents prosecuted Taisei's claims against appellants without probable cause to believe they were based in fact, or supported by reasonable inferences from known facts.

### 2. *Legal Tenability*

A malicious prosecution action lies if any theory or claim is not supported by probable cause. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 56.) The legal tenability of the theories the attorney asserts on behalf of the client is determined objectively. (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1402 (*Sycamore Ridge*).) The test is whether "any reasonable attorney would have thought the claim tenable." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 886.)

Respondents prosecuted a complaint which alleged that appellants had aided and abetted Wilshire's fraud and negligent misrepresentation. "Liability based on an aiding and abetting or conspiracy theory is . . . 'derivative,' i.e., liability is imposed on one person for the direct acts of another." (*Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 579.) Under the "agent's immunity" rule, an agent cannot be held derivatively liable for conspiring with or aiding and abetting the principal on whose

15

behalf and for whose benefit the agent is acting.  (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 817.)  Nevertheless, an agent may be directly liable for its own torts and may be liable for promissory fraud committed while acting on behalf of a principal.  (*Fleet v. Bank of America N.A.* (2014) 229 Cal.App.4th 1403, 1411–1412.)

Generally, the allegations of the underlying complaint are to be liberally construed in the light most favorable to the malicious prosecution defendant.  (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1402.)  However, "fraud must be pled specifically; general and conclusory allegations do not suffice.  [Citations.]  'Thus "'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.'"  [Citation.]  [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."'  [Citation.]"  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)

The only dates on which the four misrepresentations alleged in the first amended complaint were made are those appearing on documents appended to that complaint and incorporated by reference.  The two such documents included in the record on appeal— the original contract and change order no. 16—are both signed by Shekhter on behalf of Wilshire.  While the allegations may be sufficient to hold Shekhter liable for any promissory fraud he committed in signing the documents as Wilshire's agent or alter ego, the same cannot be said for appellants.  The attempt to impose on them derivative liability for Shekhter's alleged misrepresentations is barred by the agent's immunity rule.  The attempt to avoid that rule by alleging that appellants actually made the four misrepresentations fails because the only misrepresentations sufficiently alleged are those made in documents signed by Shekhter.  (See *Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 ["If facts appearing in the exhibits contradict those alleged, the facts in the exhibits take precedence"].)

To the extent the negligent misrepresentation claim was based on the same four contractual promises of future performance, it is legally untenable for the additional

reason that promissory fraud may not be recast as negligent misrepresentation. (*Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 458.)

The conclusory allegation in the first amended complaint that appellants aided and abetted Wilshire in "fabricating sham grounds" for nonpayment cannot be read to allege a separate claim for fraud, or negligent misrepresentation, against any of the named defendants. (See *Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1254 [conclusory allegations of fact are not subject to liberal construction].) Specifically, there is no allegation that Taisei reasonably relied to its detriment on any of the asserted grounds for nonpayment; instead, the only alleged reliance is on contractual promises, and as we have explained, the only such promises sufficiently alleged are those made by Shekhter on behalf of Wilshire.

As to appellants, the agent's immunity rule precludes aider and abettor liability unless appellants themselves committed a tortuous act. If Hollins' January 10, 2013 letter is any indication, the only factual support respondents had for this allegation against appellants was Frymer's failure to speak at a meeting where Shekhter claimed to have been "tricked" into signing order no. 16. But mere silence does not constitute fraudulent concealment absent a fiduciary or confidential relationship between the parties, or unless special circumstances "equitably estop a person from relying on his silence or inaction." (*Scafidi v. Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 562.) As we have explained, there is no evidence that Frymer was in any better position than Taisei to know whether Shekhter had been misled during the month of negotiations that followed his November 2005 email.

Appellants have made a prima facie case that, as pled and prosecuted, the aiding and abetting and negligent misrepresentation theories against appellants were legally untenable.

*B. Malice*

The malice element of malicious prosecution does not require that the defendant harbor actual ill will toward the plaintiff, and liability attaches to attitudes that range "'from open hostility to indifference. [Citations.]'" (*Soukup*, *supra*, 39 Cal.4th at

17

p. 292.) Although lack of probable cause by itself is insufficient to support a finding of malice, it is a factor to be considered in combination with other evidence. (*Daniels*, *supra*, 182 Cal.App.4th at p. 226.) Malice may be inferred from knowingly bringing or continuing to prosecute an action without probable cause or for an improper motive. (*Ibid.*)

Respondents argue they were entitled to rely on Taisei's privileged communications, and they pursued the case zealously on behalf of Taisei until December 2012, when Frymer and Molnar provided testimony that, according to respondents, for the first time placed them on notice Taisei's first amended complaint "was on shaky ground." Respondents also argue they cannot effectively defend against the claim of malice because they cannot disclose that they advised Taisei to dismiss appellants from the first amended complaint after Frymer's and Molnar's depositions and threatened to withdraw as counsel if it did not.

The record on appeal gives rise to conflicting inferences, which militate against summarily dismissing appellants' case. There is no evidence anyone at Taisei told respondents that Frymer had made any affirmative representations or had engaged in any misconduct; on the contrary, the first amended complaint as drafted avoids application of the agent's immunity rule as to appellants, without regard to the fact that they had not signed any of the documents on which Taisei based its claims. The allegation that Frymer aided and abetted Shekhter in fabricating grounds for nonpayment appears to have been based on nothing more than a suspicion or conjecture because of his position as the owner's agent on site. Molnar's deposition testimony revealed that Frymer had made no misrepresentations during contract negotiations and that Molnar had not implicated Frymer in any fraud. Respondents cannot identify Molnar as the source of the fraud claims against appellants without raising issues of credibility.

This case, therefore, is distinguishable from *Daniels*, *supra*, 182 Cal.App.4th 204, 223–224, where in the absence of contrary evidence, the court assumed the attorneys based the defamation allegations in the underlying case on what their client told them. Their inability to prove the client's claims because the client refused to name witnesses to

the defamatory statements did not support "an inference that they knew there was no probable cause for continuing to prosecute" the defamation cause of action. (*Id*. at p. 227.) Here, the record supports an inference that respondents did not proceed on factual allegations made by their client, but on conclusions devoid of any basis in fact.

Respondents' insistence that they needed to complete Frymer's deposition before recommending dismissal does not support an inference that they were diligently prosecuting the fraud claims against appellants absent evidence that during the last two deposition sessions, in December 2012, they asked Frymer any questions relevant to those claims. Appellants' evidence shows they did not, and respondents have failed to rebut that showing. Respondents' own evidence supports the conclusion that Frymer was an important witness to Taisei's defense to Wilshire's claims against Taisei, which respondents handled as Taisei's *Cumis* counsel. Thus, absent evidence that in the last two deposition sessions respondents questioned Frymer about his own alleged fraudulent acts, it is reasonable to infer they kept him as a party in the case in order to have leverage over him as a witness.

Appellants object to respondents' reliance on their settlement offer, arguing that it is privileged on its face and under Evidence Code sections 1119 (mediation privilege), 1152 (compromise offers inadmissible to establish liability), 1154 (discount offers inadmissible to prove invalidity of claim). We disagree. There is no indication appellants' offer to settle the case was made in a formal mediation proceeding; nor was it used to prove appellants' liability for fraud or the invalidity of their claim. Appellants themselves rely on Hollins' January 10, 2013 letter, which also is marked "confidential settlement communication."

But we agree that appellants' offer cannot be used to justify respondents' continued prosecution of baseless claims against them. Notably, it was not until Molnar's deposition testimony on December 19, 2012, that appellants received confirmation that Taisei's claims were not based on any actual representations Frymer had made during contract negotiations. The same is not necessarily true for respondents,

19

who presumably knew what to expect from the testimony of their client's corporate representative.

Respondents suggest that the attorney-client privilege precludes them from offering evidence that they advised Taisei they would withdraw as counsel unless it dismissed the first amended complaint after the conclusion of Frymer's and Molnar's depositions in December 2012. But Hollins' January 10, 2013 letter indicates that respondents were unwilling to dismiss the case, or withdraw as counsel, even in the face of a pending motion for sanctions against them personally for prosecuting a frivolous complaint (Code Civ. Proc., § 128.7). Although Hollins purported to write the letter on behalf of Taisei, he used the personal pronouns "I" and "we" in threatening an escalation in the litigation against appellants and an increased exposure for them if they did not withdraw the motion, even as he acknowledged that Taisei's case was primarily against Wilshire and Shekhter. While respondents are correct that a client's malice may not be imputed to counsel (*Daniels*, *supra*, 182 Cal.App.4th p. 227), Hollins' letter supports the conclusion that respondents personally threatened appellants with continued and increased prosecution of a complaint they knew was frivolous for the improper purpose of avoiding sanctions. (Cf. *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1544 [thinly veiled threats of ongoing litigation supported prima facie case of malice against attorney].)

Viewing the evidence in appellants' favor, as we are required to do at this stage of the proceeding, we conclude that appellants made the requisite showing of probability of success on the merits, and respondents did not defeat that showing as a matter of law. The trial court erred in granting respondents' anti-SLAPP motion on this record.[3]

---

[3] Because respondents did not prevail on their motion, they are not entitled to attorney fees under the anti-SLAPP statute. (Code Civ. Proc., § 425.16, subd. (c)(1).) We express no position on the merits of appellants' motion for attorney fees and costs under the same statutory provision, which the trial court did not consider.

20

## DISPOSITION

The order is reversed and the matter is remanded for further proceedings.
Appellants are entitled to their costs on appeal.


                                        EPSTEIN, P. J.

We concur:



WILLHITE, J.



COLLINS, J.